(No. 53929.—

THE PEOPLE *ex rel.* DIRECTOR OF FINANCE, Appellee, v. YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF SPRINGFIELD *et al.,* Appellants.

*Opinion filed September 30, 1981.*

Barber, Hall, Segatto & Hoffee, of Springfield (Henry R. Barber, Carl O. Hoffee, and Richard C. Edwards, of counsel), for appellant Young Women's Christian Association of Springfield.

Tyrone C. Fahner, Attorney General, of Springfield (Roy E. Frazier, Jr., Assistant Attorney General, and Raymond L. Terrell and Robert B. Powers, Special Assistant Attorneys General, of counsel), for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The Director of Finance (hereafter the State), on behalf of the Capital Development Board (hereafter CDB), filed a petition on August 26, 1976, seeking to condemn, for construction of a "courts complex" building for the use of the Fourth District Appellate Court, Sangamon County Circuit Court and a law school or paralegal training program, an entire block in downtown Springfield, including improved property at the southeast corner of that block, belonging to the Young Women's Christian Association of Springfield (YWCA). The State filed a November 1 motion *in limine* to prohibit the YWCA from introducing evidence of replacement or reconstruction costs relevant under the

YWCA theory that the property was "special use" property entitled to unusual valuation rules. On November 3 the YWCA filed a traverse and motion to dismiss, denied September 7, 1977. Pursuant to our Rule 308 (58 Ill. 2d R. 308) the circuit court certified three valuation questions raised by the motion *in limine*, and those questions were decided by this court in *People ex rel. Director of Finance v. YWCA* (1979), 74 Ill. 2d 561. Following that decision, a jury trial was held and a judgment fixing total compensation to be paid the YWCA at $1,135,960 was entered. From this final judgment the YWCA appealed and the case was transferred to this court pursuant to our Rule 302(b) (73 Ill. 2d R. 302(b)).

An appropriation for a courts complex was first made in 1974. The Governor, on November 6, 1975, gave, as required by section 51 of the Civil Administrative Code of Illinois (Ill. Rev. Stat. 1975, ch. 127, par. 51), his consent to acquisition of the subject property. Discussions among potential users of the complex resulted in a December 1975 program statement containing the following certificate:

> "As attested by the signatures affixed below, the undersigned agree that their facilities described in this document are sufficient in both quality and quantity to accommodate those activities scheduled to occupy them through calendar year 1980. The Capital Development Board affirms the reasonableness of the facilities planned for the activities projected."

This certificate was signed by Judge J. Waldo Ackerman on behalf of the Sangamon County circuit court.

The only indication that members of the Sangamon County Board (hereafter county board) were aware of such discussions is a letter dated October 1, 1974, from the chairman of the county board, which stated:

> "This letter will confirm sentiments expressed at a meeting held on September 27 between Judge James Craven, John Huther of the Board of Higher Education, Don Brown and Dave Rinker of the Capital Development Board.

You should be advised that the location of the square block surrounded by Fourth, Fifth, Capitol and Jackson meets with the approval of the Sangamon County Board as a site for the proposed Circuit Court-Appellate Court-Law School complex. The Sangamon County Board certainly looks with favor upon the project and hopes to work closely with your office and others to see the eventual fulfillment of the plan.

I will be pleased to meet with the Capital Development Board on October 10 and at other such times as you may feel appropriate."

An internal CDB memo dated April 2, 1976, from Waler Ross, the then project manager, indicates that this initial contact was not followed by continued involvement of the county board:

"The relationship of the Sangamon County Board to this project is one which should have been foreseen at least a year and a half ago, and should have been a part of the public relations and programming effort which I referred to in Item 2 above. You state that Mr. Hess and I should be concerned with this situation. We are. However, you must realize that inasmuch as they have been ignored ever since the beginning of this project it is inopportune to go running to them after public meetings have been held, and ask them to suddenly become involved. Now that we have put ourselves in this position, it would appear to me that our best course would be to allow these public airings to subside a little and then approach them with the mechanics of the problem as being merely a part of the mandate which was given in the Appropriation, which provides for the construction of Circuit Court facilities."

The memo concluded that Ross would suggest that the CDB architects "cool it" until the CDB could "get our own house in order." The CDB passed a resolution on June 10, 1976, which read in part:

"WHEREAS, staff has advised that for the record

in connection with condemnation proceedings it is recommended that the selection of such site be formally confirmed by resolution of the Board.

NOW, THEREFORE, BE IT RESOLVED, that the Capital Development Board of the State of Illinois hereby formally confirms the designation of the site for the Courts/Law School Complex, CDB Project No. 007—010—001, is the site bounded by 4th, 5th, Capitol, and Jackson Streets in the City of Springfield, Illinois, and hereby confirms the authority of the Board's staff to acquire parcels of property within the boundaries of such site either by purchase or by condemnation and ratifies and confirms all acts of the Board's staff heretofore taken to such end."

The petition for condemnation, filed August 27, 1976, stated:

"3. That it is necessary that the Petitioner have and acquire the lands, rights or other property hereinafter described for a public use and purpose and that said lands, rights or other property are required for the public use and purpose of constructing and effecting public improvements on the same for the use and benefit of the State of Illinois, to wit: a Courts' Complex for the Circuit Court and Appellate Court and the legal and paralegal public education.

4. That, under and by virtue of Article I of the Capital Development Act, approved October 11, 1973, as amended (Chapter 127, Paragraphs 771 through 783, Illinois Revised Statutes, 1975), the Capital Development Board of the State of Illinois is engaged in the acquisition, construction and completion of the Courts' Complex for the Circuit Court and Appellate Court and legal and paralegal education in Springfield, Sangamon County, Illinois, and that, for such purposes, has determined by resolution duly adopted on June 10, 1976 that the lands, rights or other property hereinafter described, together with other lands, rights or property bounded by Fourth, Fifth, Capitol and Jackson Streets in the City of Springfield, County of

Sangamon, State of Illinois, are necessary to be acquired for such public purposes."

A September 7, 1976, letter from the Sangamon County clerk indicates that, as of that date, no resolution affecting "in any way" the location of the Sangamon County circuit court had been passed by the county board. The YWCA traverse and motion to dismiss filed November 3, 1976, stated in part:

"11. Only the Sangamon County Board has the power and duty to select a site for, and build or lease, a courthouse for Sangamon County. (Ill. Rev. Stats., C. 34, Sec. 432). The Sangamon County Board has not selected the site in question for a courthouse or for the Circuit Court. In fact, the Sangamon County Circuit Court is now occupying modern air-conditioned facilities only about twelve years old, which facilities are being leased by the County from the Springfield Building Commission under a long term lease. There is no public necessity for the taking of defendant's property. As yet, no one has conducted an in-depth study as to the need of Sangamon County for a new court facility. Petitioner is proposing to condemn property for, and to construct, a building for the Sangamon County Circuit Court without the authority or consent of the Sangamon County Board. Such court building, if constructed, may never be utilized for the purposes intended."

On January 11, 1977, a resolution, suggested in part by CDB staff members, was approved by the county board. It stated:

"WHEREAS, the State of Illinois Capital Development Board, hereinafter referred to as 'CDB', is in the process of developing a Courts and Legal Studies Complex, hereinafter referred to as 'Complex', from funds appropriated by the General Assembly of the State of Illinois;

\* \* \*

WHEREAS, CDB has heretofore authorized the payment of funds to Special Assistant Attorney Gen-

erals, appointed by the Attorney General for the purpose of commencing condemnation proceedings with regard to such site;

\* \* \*

WHEREAS, it is in the interest of the State of Illinois to establish a model circuit courtroom facility so as to improve the quality of justice in the State of Illinois;

WHEREAS, it has been determined that the use of that portion of the Complex for the Seventh Judicial Circuit Court, Sangamon County, Illinois, and related court services will be of benefit to the State of Illinois in connection with the providing of a model circuit court facility, CDB has stated that it will cause that portion of the Complex allocated to the Seventh Judicial Circuit Court, Sangamon County, Illinois, and related court services to be made available to Sangamon County on a long-term basis, wherein Sangamon County will pay for said use and occupancy only its pro rata share of operation and maintenance costs for that portion of the Complex devoted to Seventh Judicial Circuit Court, Sangamon County, Illinois facilities and related court services.

NOW, THEREFORE, BE IT RESOLVED that the Sangamon County Board concurs with the development of the project, and it is the judgment of the Board that, in the event such Complex is constructed and space allocated as shown in said Program Statement, it would be necessary and convenient to and in the best interest of Sangamon County to negotiate an agreement with the State of Illinois on the basis of the statement of CDB referred to hereinabove and to relocate its Seventh Circuit Court, Sangamon County, Illinois, facilities and related court services to the space provided for in said Program Statement to said Complex."

Four witnesses testified for the State at the hearing on the motion to dismiss. Judge Roy O. Gulley, Administrative Director of the Illinois Courts, testified concerning the

Fourth District Appellate Court's involvement in the project, noting in passing that the Sangamon County circuit court had a new, modern, air-conditioned courthouse building, one of the 20 or 25 newest circuit court facilities in the State.

Daniel Pramlet, a land-acquisition official for the CDB, testified that the CDB did believe that there had to be a consensus of the county board, although it did not believe that consensus need be in writing. The witness testified that there was neither a formal written agreement concerning the rent to be charged nor any county-board-approved program statement, although over 50% of the complex's "net square footage" would be used by the circuit court.

Jerry Hess, a planning supervisor for the CDB, testified that more than half of the usable floor space of the complex would be occupied by the circuit court. He stated that the CDB was not to determine need for the building in the first place, and had not done any study of the adequacy of the circuit court's 12-year-old building, or of the court buildings throughout Illinois. After his work on the project, however, the witness had personally felt that the project would be beneficial to the State. The witness testified that, if the CDB had tried to construct the appellate court and legal education facilities separately from the circuit court facilities, "it [the project] wouldn't have worked."

Dasol Mashaka, the project manager for the CDB at the time of the hearing on the motion to dismiss, testified that the Sangamon County circuit court would be the single largest use of the building, approximately 50%, that the size of the tract required was directly related to the size of the building, and that the circuit court would make the greatest demand on parking facilities. The witness admitted that he had seen the absence of a use agreement with the county board as a potential barrier. A couple of weeks prior to the January 11, 1977, county board meeting, he had participated in a discussion with county board members concerning

what should be stated in the county board resolution. The witness also admitted making the following statements at the January 11 county board meeting:

"Now, I want to clarify one thing of how binding this is. What will happen is after we go ahead with condemnation proceedings, we'll continue to plan the project. In the meantime in the next few months we'll come back at a later time when we see about when this thing is going to start construction and possibly let the Board and the state agency that's going to manage the building start working on an agreement. And, of course, at that time—now that's when you can decide whether or not you want to go with the building or whether you agree with the kind of agreement that we have—we're coming up with. This is not the final phase in terms of whether you go into the building. We still got to develop an agreement that we must all agree to in relationship to—before the building will naturally get built or will be completed."

In stating that the CDB had not done a "needs study," the witness made an isolated reference to the existence of one done by either the county board or the circuit court itself "independent of the project," but neither that study, nor its conclusions, nor any information about it was introduced in evidence. After the witness had stated several times that the CDB did not make a study of need for the complex and that it does not make such determinations, the following exchange between the attorney for the State, Raymond Terrell, and his witness, took place:

"Then what planning went on with respect to allocating use, determining need on the part of the using agencies?

A. All that went on it— we did not make the study or develop any data relating to the need for the project that I am familiar with.

Q. Did you not ask the using agencies what their space requirements were?

A. Yes, we did.

Q. Is that not a— delving into or inquiring into need requirements of the using agencies, Mr. Mashaka?

MR. HOFFEE: I think Mr. Terrell is cross-examining his own witness at this point, and I would object to that.

\* \* \*

THE WITNESS: I'm answering this question different from the way I answered it from the previous question. We did ask— we did ask them to define what their needs were.

MR. TERRELL: All right.

THE COURT: All right.

MR. TERRELL: And did they respond to that request?

A. Yes, they did.

Q. And did CDB analyze those responses?

A. Yes, we did.

\* \* \*

Q. So then let me ask you whether or not CDB has anything to do with respect to evaluating and determining necessity for and need for space?

\* \* \*

THE COURT: Do you know what the— Do you understand the question?

A. THE WITNESS: Yeah, but there is one—there is one point in his question that if I answered yes or no I don't think I'd— it would be correct.

MR. TERRELL: What is your answer, sir?

THE WITNESS: I'd say yes.

MR. TERRELL: All right, thank you."

The witness also testified that the CDB "established" that those needs were "valid."

Later the witness acknowledged that the CDB had not considered whether the building presently occupied by the circuit court adequately serves the needs of the circuit court:

"\* \* \* you evaluated their requests for space within your building, isn't that right?

A. Yes.

Q. Not as to whether or not they needed to move into your building?

A. Right."

The witness believed that the State would agree to permit the circuit court to occupy the complex, in exchange for paying its *pro rata* share of costs, but that no final agreement could be made until the CDB had the final specifications for the complex.

The State has asked, without any objection by the YWCA, that judicial notice be taken of the fact that the State now has title to the entire block sought, with the exception of the YWCA property, consisting of roughly two lots in the southeast corner of the block. The fact that we do so does not imply that we regard our decision in this case as affecting in any way the already acquired title to the non-YWCA land. The YWCA asks this court to take judicial notice of the fact that the county board on April 14, 1981, passed a resolution stating:

"WHEREAS, Sangamon County services have been growing at a greater rate than it has useable office space; and,

WHEREAS, Sangamon County has been desirous of joining with the State of Illinois to incorporate our Court System with the proposed Court Complex funded by the State of Illinois; and,

WHEREAS, negotiations with the appropriate State officials has [sic] revealed that the State of Illinois is not willing to include Sangamon County in its complex.

THEREFORE, BE IT RESOLVED THIS 14TH DAY OF APRIL, 1981 THAT THE SANGAMON County Board through its Chairman approves the official withdrawal from the proposed State of Illinois Court Complex and that the Chairman is authorized to inform the appropriate State officials."

The United States Supreme Court in *United States v. Carmack* (1947), 329 U.S. 230, 237-38, 91 L. Ed. 209, 215,

67 S. Ct. 252, 255, indicated that the power of eminent domain is itself the outgrowth of political necessity, quoting Mr. Justice Strong's words in *Kohl v. United States* (1876), 91 U.S. 367, 371-72, 23 L. Ed. 449, 451:

"'*** No one doubts the existence in the State governments of the right of eminent domain,—a right distinct from and paramount to the right of ultimate ownership. It grows out of the necessities of their being, not out of the tenure by which lands are held. It may be exercised, though the lands are not held by grant from the government, either mediately or immediately, and independent of the consideration whether they would escheat to the government in case of a failure of heirs. The right is the offspring of political necessity; and it is inseparable from sovereignty, unless denied to it by its fundamental law. * * *'"

Article I, section 15, of our constitution (Ill. Const. 1970, art. I, § 15) provides:

"Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law."

This court stated of the corresponding provision of the 1870 Constitution in *Department of Public Works & Buildings v. Ryan* (1934), 357 Ill. 150, 154-55:

"The power to exercise eminent domain is inherent in the State. Section 13 of article 2 of our constitution does not confer such power but recognizes that such power is in the State. Section 13 is a restraint and limitation placed upon the exercise of this power as against the right of the private citizen except in those cases where public necessity requires the taking of private property for public use, and such property can then be taken only by the payment of just compensation. *** The private property of the owner can only be taken against his will by strict conformity with the law granting the right of eminent domain. [Citation.] The legislature has the power to confer the right of eminent

domain, but it is the province of the court to determine whether such grant of power has been made and whether it is exercised within the grant. [Citation.] The construction to be placed by the court upon any law purporting to authorize the taking of private property for public use is one of strict construction. [Citations.] The Department of Public Works and Buildings is merely a governmental agency of the State created by legislative act and has no power or authority beyond that conferred upon it by the legislature."

The Director of Finance filed this case after an appropriation and the consent of the Governor as provided in section 51 of the Civil Administrative Code of Illinois (Ill. Rev. Stat. 1975, ch. 127, par. 51), which reads in part:

"The Director of Finance is authorized, with the consent in writing of the Governor, to acquire by private purchase, or by condemnation under the Eminent Domain Act, all other lands, buildings and grounds for which an appropriation may be made by the General Assembly."

The legislature, of course, cannot, by delegating the power of eminent domain, dispense with constitutional requirements restricting its use, including the requirement of "necessity." In a condemnation action at least four issues concerning necessity may be readily distinguished: (1) whether the declared public use is necessary, (2) whether some property of the general type being condemned is necessary to serve the declared public use, (3) whether the property condemned is necessary as opposed to neighboring or similar properties, and (4) whether it is necessary to acquire the subject property by eminent domain as opposed to voluntary sale or lease. In the present case we consider only the second issue.

The inquiry of Illinois courts into the existence of necessity in an eminent domain case is limited but crucial. As this court wrote in *City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 597:

"The general rule is that where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted. [Citations.] An abuse of such power, however, will not be tolerated, and if no necessity for its exercise exists, or if it appears that the quantity of the property sought to be taken is grossly in excess of the amount necessary for the public use, the court will not permit the land to be taken."

See also *United States v. Carmack* (1946), 329 U.S. 230, 243-46, 91 L. Ed. 209, 218-20, 67 S. Ct. 252, 258-60.

In *City of Chicago v. Lehmann* (1914), 262 Ill. 468, 470-71, this court stated:

"The petition alleged that the lots were necessary for the public use specified, and that was a material allegation which was denied by the defendant. The question whether the sovereign power of eminent domain shall be conferred upon corporations or municipalities to appropriate private property for public use is legislative and not subject to interference by the courts [citation], but the question whether the particular property sought to be appropriated is necessary for the public use is for the courts. If the necessity does not exist the land cannot be taken, and the property owner would be without the protection to which he is entitled if the determination of a corporation, private or municipal, to take his property conclusively settled the necessity of the taking. If that were so, the law would not require any averment of necessity but only an allegation of intention to take the property. The owner of property may challenge the right to take it by denying the averment of necessity, and the issue so made is a preliminary one, to be decided by the court. [Citation.] Under every rule of pleading the burden was upon the petitioner to introduce such evidence as

would *prima facie*, at least, prove the disputed aver-
ment. The essential preliminary requisite being the
necessity for the appropriation of the land, and that
fact being affirmed by the petitioner and denied by
the defendant, the burden rested upon the petitioner
to show the fact. That is not only in conformity with
rules of pleading, but it has been established by the
authorities and assumed in all cases in this court.
[Citations.] In determining the issue the question of
necessity is largely left to the determination of the
corporation, but that determination is subject to the
right of judicial review and revision for an abuse of the
power, which will not be tolerated. If it appears that
the quantity of the property sought to be taken is
grossly in excess of the amount necessary for the
public use the right to take it will be denied. *** The
court erred in finding the issue made in favor of the
petitioner, with no evidence of a reasonable necessity,
or any necessity whatever, to take the property for the
public use."

In *Trustees of Schools v. First National Bank* (1971), 49 Ill.
2d 408, this rule was reaffirmed and it was decided that a
recitation of necessity contained in a resolution of the
proper body would make out a *prima facie* case of necessity:

"Defendant is correct in his assertion that the
burden of proof on the issue of necessity is upon the
petitioner. (*City of Chicago v. Lehmann,* 262 Ill. 468.)
However, where a resolution of the governing body
which makes the finding of necessity is introduced into
evidence a *prima facie* case is made. It is then the duty
of the defendant to go forward with evidence in
support of his contention that there was an abuse of
discretion by the governing body. [Citations.] The
Board of Education adopted a resolution determining
that it was necessary for the best interests of the school
district that this property be acquired. This resolution
was introduced into evidence at the hearing on the
traverse. It was then the duty of defendant to go
forward with evidence in support of his contention

that the taking was excessive." (49 Ill. 2d 408, 414.)

It has also been held that an eminent domain petition is properly dismissed where no formal resolution embodying a finding of necessity had, on the date of filing of the petition, been adopted, even though a subsequently adopted resolution referred to action taken at an executive meeting of the responsible body prior to the filing of the petition. (*Goldman v. Moore* (1966), 35 Ill. 2d 450.) The court there emphasized the importance of the legislative finding of necessity:

"Although the statute does not specifically require formal action by the condemnor, such a requirement necessarily follows from the effect that is given to the condemnor's determination of the necessity for the taking. 'The question of the necessity for the land to be taken is left largely to the determination of the corporation, subject to judicial review and revision on abuse of the right, and where the court finds that the use for which the property is to be taken is a public one, it will not inquire into the amount of property necessary for such use, unless it appears that the quantity of property taken is grossly in excess of the amount necessary. [Citations.]' [Citation.] It has been held that while a condemnor is not required to offer in evidence the ordinance or resolution under which it is proceeding, the property owner has the right to have it produced, and where none was forthcoming, the proceeding failed. *City of Mound City v. Mason,* 262 Ill. 392, 297; see also, *City of Rockford v. Rockford Life Insurance Company,* 16 Ill. 2d 287.

When the eminent domain petition in this case was filed, no formal action had been taken by the board with respect to the acquisition of the land in question. Until about nine months after the filing of the petition, no record existed by which any property owner or interested citizen could determine the position of the board with respect to the acquisition of the property in question. Whether in this case a specific

evil resulted from this deficiency is beside the point. The procedure followed obviously lends itself to improper conduct on the part of public officials." 35 Ill. 2d 450, 453-54.

The Sangamon County Board is by statute charged with the responsibility of providing a suitable courthouse for the Sangamon County circuit court. Section 26 of "An Act to revise the law in relation to counties" (Ill. Rev. Stat. 1975, ch. 34, par. 432) states:

"It shall be the duty of the county board of each county:

First—To erect or otherwise provide when necessary, and the finances of the county will justify it, and keep in repair, a suitable court house, jail and other necessary county buildings, and to provide proper rooms and offices for the accommodation of the county board, State's attorney, county clerk, county treasurer, recorder and sheriff, and to provide suitable furniture therefor.

\* \* \*

Sixth—To provide proper rooms and offices, and for the repair thereof, for the accommodation of the circuit court of the county and for the clerks for such court, and to provide suitable furnishings for such rooms and offices, and to furnish fire proof safes, and the repair thereof, for the offices of the clerks of the circuit court of the county."

The county board's duty to provide a courthouse is imperative. (*County of Mercer v. Wolff* (1908), 237 Ill. 74; see also *People ex rel. Goodman v. Wabash R.R. Co.* (1946), 395 Ill. 2d 520.) In the present case it is clear that, as of the date of the filing of the petition to condemn, no formal determination of necessity had been made by the county board. Even the resolution passed January 11, 1977, over four months after the filing of this action, and over two months after the filing of the motion to dismiss, merely indicated an intent to negotiate an agreement with the State at some indefinite future date, not a finding that it was

necessary that the circuit court be provided with new facilities. CDB employees' testimony and the January 11 county board resolution indicated a hope of negotiating an agreement to lease the facility based on "pro rata" sharing of "costs," but even the method of such calculation was indefinite. Although the county board resolution referred to the program statement certificate signed by a representaive of the circuit court, that certificate only indicated that the facilities described in the program statement would be sufficient for the projected activities of the circuit court through 1980, not that those new facilities would be needed in order to accommodate those activities.

Nor can the June 10, 1976, resolution of the CDB, to which the petition for condemnation referred, be considered a substitute for the county board's finding of necessity. That resolution, taken together with the appropriation bill, the Governor's consent, and section 51 of the Civil Administrative Code of Illinois, did authorize the filing of the petition. The constitutional requirement of necessity, however, is separate, and under section 26 that determination of necessity was to be made by the county board. Even if the CDB *had* been able, despite section 26, to make the determination of the needs of the circuit court, testimony of CDB officials indicates that no determination of the need for new circuit court facilities was ever undertaken by the CDB. We would not defer to a mere self-serving recitation of necessity in any event (*People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347), but no recitation of necessity was even included in the CDB resolution.

Finally, the State attempts to rely on the appropriation itself as a finding of necessity. However, an appropriation bill must, under our constitution, be limited to the subject of appropriations, and not contain substantive law. (*Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142, 148; *People ex rel. Kirk v. Lindberg* (1974), 59 Ill. 2d 38, 42.) If construed to be a mandate that it was necessary that the Sangamon County

circuit court move to the courts' complex, it would shift responsibility for housing the circuit courts of the State embodied in section 26, and to that extent would be a change in the substantive law, improperly included in an appropriation bill.

It should be noted, too, that, while governmental bodies have some discretion as to the amount of property to be taken for a public use, the courts must intervene if the amount taken is excessive. Future needs cannot excuse the taking of an excessive amount of property. In *City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 598, this court stated that only needs of the public "which may be fairly anticipated in the future" may be considered. (See *City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594. See also *Salt Lake County v. Ramoselli* (Utah 1977), 567 P.2d 182; *City of Helena v. DeWolf* (1973), 162 Mont. 57, 508 P.2d 122; *O'Neil v. Board of County Commissioners* (1965), 3 Ohio St. 53, 209 N.E.2d 393; *City of Phoenix v. McCullough* (1975), 24 Ariz. App. 109, 114-15, 536 P.2d 230, 235-36.) If over half of the total area sought were being taken without any showing of need, present or future, it is apparent that the amount of property sought by the petition would be "grossly excessive" (*City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594, 604) and the entire petition invalid.

Testimony indicated that fully half of the land sought for the complex was to be used by the circuit court. Over 50% of the floor space and the greater part of the parking facilities were attributable to the circuit court. Since there was no legislative finding of necessity for the circuit court's part of this complex, there was no finding to which a trial court would be required to defer that this half of the property sought was needed for a public use. In *Chicago, Burlington & Quincy R.R. Co. v. Abens* (1922), 306 Ill. 69, and in *Chicago, Milwaukee & St. Paul R.R. Co. v. Franzen* (1919) 287 Ill. 346, we held that certain regulatory consents were not conditions precedent to a condemnation action. In

this case, the absence of a legislative finding of necessity would not be fatal if it were otherwise unequivocally established by this record that this property was necessary for Sangamon County circuit court use. The case turns on whether, lacking such legislative determination, the record contains such evidence to support the trial court's implicit finding that necessity existed. (*Trustees of Schools v. First National Bank* (1971), 49 Ill. 2d 408.) Virtually the only information that the court had concerning the present Sangamon County circuit court facility was the fact that it was a 12-year-old air-conditioned building—among the newest of Illinois courthouses. Obviously it cannot be said that there was any substantial evidence of need for that portion of the property sought for the circuit court's use, and the petition attempting to take the entire block should have been dismissed as an attempt to take a "grossly excessive" amount of land.

Defendant urges that we take judicial notice of the earlier quoted resolution of the county board, formally withdrawing from the project. This resolution was adopted by the county board on April 14, 1981, while this appeal was pending. Article VI, section 4(a), of our constitution (Ill. Const. 1970, art. VI, §4(a)) provides: "(a) The Supreme Court may exercise original jurisdiction *** as may be necessary to the complete determination of any cause on review." Section 2 of "An Act in relation to judicial notice" (Ill. Rev. Stat. 1979, ch. 51, par. 48b) states in part:

"§ 2. Courts of appellate jurisdiction. Upon the review by any court of appellate jurisdiction of a judgment or order of a circuit court the court of appellate jurisdiction shall take judicial notice of all matters of which the circuit court was required to take judicial notice, including all rules of practice adopted by the circuit court."

Section 1 (Ill. Rev. Stat. 1979, ch. 51, par. 48a) provides:

"§ 1. Courts of original jurisdiction. Every court of

original jurisdiction, in addition to the matters of which courts of original jurisdiction have heretofore been required to take judicial notice, shall take judicial notice of the following:

First. All general ordinances of every municipal corporation within the State.

Second. All ordinances of every county within the State."

This court interpreted sections 1 and 2 in *Scott v. Rochford* (1979), 77 Ill. 2d 507, to require that this court take judicial notice of rules promulgated pursuant to municipal ordinance as well as certificates evidencing their publication. We believe that we should take judicial notice of the resolution. Although *Blanchette v. Connecticut General Insurance Corporations* (1974), 412 U.S. 102, 42 L. Ed. 2d 320, 95 S. Ct. 335, implies that under some circumstances a decision might be rendered by a reviewing court based upon facts which have changed from the situation in the trial court, we rely on the April 14, 1981, resolution only to reassure us that no necessity for the condemnation of land for a new circuit court facility ever did exist. The April 14 resolution may well indicate that if the CDB had gone to the board and sought an explicit and definite resolution at the outset, the county board would have refused to adopt such a resolution.

Accordingly, the judgment of the circuit court of Sangamon County is reversed and this cause remanded with directions to dismiss the petition.

*Reversed and remanded,*
*with directions.*