ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Petitioner-Appellant, v. PATRICK V. DiBENEDETTO *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—94—3924

Opinion filed September 8, 1995.

ZWICK, J., concurring.

Brian L. Crowe and Mara S. Georges, Special Assistant Attorneys General, of Chicago, and Illinois State Toll Highway Authority, of Downers Grove (Katherine L. Lee and Algirdas P. Ambutas, of counsel), for appellant.

Earl L. Neal & Associates, of Chicago (Michael D. Leroy, Langdon D. Neal, and Norman Light, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

The Illinois State Toll Highway Authority (Authority) appeals from an order dismissing its petition to condemn property consisting of nine acres of unimproved land (the property) located at the southeast corner of Beverly Road, Cook County, Illinois, and the Northwest Tollway (I-90) and adjacent to the tollway. The property is owned by the defendants, Patrick and Ann DiBenedetto, and was needed to complete the construction of an interchange at Beverly Road and the Northwest Tollway in the Village of Hoffman Estates (Village). The interchange would serve the Village's western development area, which consists of approximately 2,700 acres of land. Sears,

Roebuck and Co. (Sears) occupies approximately 780 acres of the western development area.

In 1989, Sears anticipated moving its headquarters outside Illinois. To keep Sears' operations within Illinois, the State offered various tax and other incentives pursuant to the Economic Development Area Tax Increment Allocation Act. (20 ILCS 620/1 (West 1992).) On February 26, 1990, the Village and Sears entered into an economic development agreement which required Sears to develop a portion of the western development area, not then owned by Sears, and to cooperate in the construction of public improvements including water, storm and sanitary sewer facilities to benefit all properties within the vicinity of Sears' project area.

On July 31, 1990, the Village entered into an annexation and development agreement with Sears which supplemented the economic development agreement and specified Sears' responsibilities in developing the project area. The cost of land acquisition was to be advanced by Sears. In the agreement, the Village and Sears acknowledged their intention that the Village enter into an agreement with the Authority for construction of the interchange project upon terms agreeable to the Village and Sears:

"E. *Funding of Beverly Interchange.*

(1) It is the Parties' intention that the Village enter into an agreement (the Beverly Interchange Agreement) with [the Authority] for construction of the Beverly Interchange upon terms consistent with this Exhibit 'N' and agreeable to the Village and the Developer. The Village shall use its best efforts to take all actions necessary to comply with its obligations under the Beverly Interchange Agreement and shall pay all amounts due under the Beverly Interchange Agreement upon advance of such funds to the Village by Developer."

The Authority, on November 29, 1990, adopted Resolution No. 13139 authorizing the Authority to enter into an interchange agreement with the Village to share the task of constructing and maintaining the interchange at the intersection of Beverly Road and the Northwest Tollway. The Village board authorized and approved two agreements on December 17, 1990: a letter agreement between the Village and Sears and the interchange agreement between the Village and the Authority. On December 20, 1990, the Authority executed an interchange agreement with the Village.

Under the interchange agreement, the Authority agreed in part to prepare the contract plans, receive the bids and award the construction contract for the interchange project after receiving approval of the plans from the Village. The interchange agreement also

provided for the acquisition of the necessary property to complete the interchange project:

"The Village agrees to attempt to timely acquire, at their sole cost and expense, in the name of the Authority and in substantial accordance with the Authority's policies and procedures, all right-of-way and easements required for or incidental to the construction of the Project. The Authority shall not be obligated to proceed with the construction of the project until all such right-of-way has been acquired. Provided, however, that if the Village gives the Authority written notice that it has been unsuccessful at acquiring all or any portion of such right-of-way and easements, then the Authority shall use all powers granted to it by law or in equity to acquire such rights-of-way and easements."

On December 20, 1990, the Village and Sears entered the letter of agreement which recorded Sears' acknowledgment of the execution by the Village of the interchange agreement with the Authority.

On November 28, 1990, Homart Development Company, a wholly owned subsidiary of Sears, negotiating on Sears' behalf, tendered an offer to the defendants for the acquisition of their property for the price of $800,000. (Homart also negotiated with two other property owners.) Homart increased that offer to $830,000 on June 28, 1991. Homart and the defendants continued to negotiate the price of the property for the next three years, and on December 2, 1993, Homart, acting on Sears' behalf, offered $1,556,000.

On January 14, 1994, Homart notified the Authority that it could not reach a mutually acceptable deal with the defendants; therefore, Homart, on behalf of Sears and the Village, requested that the Authority commence eminent domain proceedings. The Authority received a certified appraisal report fixing the value of the property at $1,022,000. This figure took into account the value of the remainder before and after the taking. On February 4, 1994, the Authority made a written offer to the defendants for the full appraised value of the property, or $1,022,000. The defendants' attorney contacted the Authority on February, 16, 1994, requesting a construction schedule for the interchange project as well as any other pertinent documents. The Authority replied on February 25, 1994, with appraisals for the property and other documentation.

Homart informed the Authority by letter dated February 21, 1994, that Sears' offer of $1,556,000 would remain open even in light of the Authority's lower offer and of the defendants' rejection of the Authority's offer. No counteroffer was extended by the defendants; and no other appraisals were submitted by the defendants. The defendants made no reply to the Authority's correspondence dated

March 14, 1994, confirming that a negotiated settlement could not occur between the Authority and the defendants due to the differing opinions regarding the effect of construction on the remainder property.

On April 21, 1994, the Authority's Board of Directors adopted a motion to amend Resolution 13557 which authorized the legal department of the Authority to hire outside counsel to acquire necessary right-of-way which Hoffman Estates was unable to acquire. The Authority filed its complaint for condemnation on April 19, 1994. On May 24, 1994, the defendants filed a traverse and motion to dismiss, and later filed an amended traverse and motion to dismiss. The amended traverse contained four claims: (1) improper delegation of authority, denial of equal protection and lack of public use by the Authority; (2) lack of good-faith negotiations between the Authority and the defendants; (3) lack of adequate authority supporting the acquisition of the subject property by the Authority; and (4) excessive amount of property sought by the taking.

On September 15, 1994, the defendants filed a motion for summary judgment alleging that the Authority did not act pursuant to a resolution to support the acquisition of the property by eminent domain.

On September 20, 1994, the Authority and four witnesses for the Authority appeared before the trial judge prepared to present evidence in support of the motion for quick-take and in contravention of the defendants' amended traverse and motion to dismiss. The Authority's witnesses included Mark A. Koplin, the EDA project manager for the Village; Daniel J. Hanesworth, the vice president of Homart; Algirdas P. Ambutas, the Authority's senior counsel; and Subhas K. Bose, the engineer for the interchange project. The judge did not hear evidence and would not hear an offer of proof; she continued the matter until October 12, 1994, for status and October 20 and 21, 1994, for hearings on the quick-take and amended traverse and motion to dismiss.

On October 20, 1994, the Authority and all its witnesses once again appeared, and its counsel requested an evidentiary hearing. The matter was continued until the afternoon, when the judge granted the defendants' motion to dismiss without allowing the Authority to present evidence. The judge found, as a matter of law, that Homart was a subagent of the Authority and that the Authority gave implied consent to Homart to act as its agent. Further, the judge found that the Authority was not engaging in good-faith negotiations with the defendants because two offers to the defendants were on the table at the same time, a $1,022,000 offer by the Author-

ity on February 4, 1994, and an offer of $1,556,000 "by its agent [Homart]." The judge also granted the defendants' summary judgment motion, ruling that the resolutions adopted by the Authority did not sufficiently identify the property. After the defendants admitted that they were presenting no further evidence, but standing on their pleadings, the Authority moved for a directed finding, which was denied. The petition to condemn was dismissed.

We will first consider the judge's ruling that the official actions taken by the Authority authorizing eminent domain proceedings did not sufficiently identify the property to be taken. We note before we begin our discussion that the petition to condemn, itself, does sufficiently identify the property.

■ The law is clear that a public body may not exercise the power of eminent domain unless it has manifested its determination to exercise that power by some official action of record. (See *City of Kankakee v. Dunn* (1929), 337 Ill. 391, 394, 169 N.E. 251; *Goldman v. Moore* (1966), 35 Ill. 2d 450, 220 N.E.2d 466.) In *Village of Depue v. Banschbach* (1916), 273 Ill. 574, 581, 113 N.E. 156, the supreme court described an enabling ordinance as the foundation of an eminent domain action, citing *People ex rel. Thatcher v. Village of Hyde Park* (1886), 117 Ill. 462, 6 N.E. 33. The law is also clear that the property to be condemned must be reasonably described in the enabling action of the condemnor, be it an ordinance or a resolution; and the failure to so describe the property is fatal to the petition to condemn. *City of Kankakee v. Dunn*, 337 Ill. at 394; *City of Rockford v. Rockford Life Insurance Co.* (1959), 16 Ill. 2d 287, 157 N.E.2d 21.

The Authority bases its argument that it sufficiently described the property in part on Resolution 13139, which authorized the Authority to enter into an interchange agreement with the Village to share the task of constructing the interchange at the intersection of Beverly Road and the Northwest Tollway. The property is at the intersection of Beverly Road and the Northwest Tollway, but so is other property. The Authority concedes that the resolution itself may have been insufficient, but argues that any insufficiency in the original resolution was corrected by the subsequent amendment which permitted the Authority to hire outside counsel to acquire necessary right-of-way which the Village was unable to acquire *and* approval by the Authority, after the petition to condemn had been filed, of a contract for the construction of the interchange. That contract sufficiently describes the defendants' property.

The defendants maintain that the actions of the Authority which occurred after the adoption of Resolution 13139 may not be used to cure any defect in Resolution 13139. They also argue that the

construction contract may not be relied upon because the Authority entered into the contract after the petition to condemn had been filed. The Authority cites cases in which the courts have held that the insufficiency of an enabling ordinance may be cured by extraneous evidence, including subsequent actions taken by the condemnor. Those cases are *People ex rel. Director of Finance v. YWCA* (1981), 86 Ill. 2d 219, 427 N.E.2d 70, and *State of Illinois Medical Center Comm'n v. United Church of the Medical Center* (1986), 142 Ill. App. 3d 498, 491 N.E.2d 1327. *State of Illinois Medical Center* held expressly, and *People v. YWCA* held tacitly, that a condemnor's failure to make a determination of necessity in its enabling ordinance will not defeat the right to condemn, if the evidence presented by the condemnor in the hearing on the motion to dismiss the petition discloses a necessity. Neither case addresses the question of the insufficiency of the description of the property.

In *City of Rockford v. Rockford Insurance Co.* (1959), 16 Ill. 2d 287, 157 N.E.2d 21, the supreme court rejected the contention of the condemnor that an enabling ordinance need not describe the property that is to be taken and reversed an order denying the motion to dismiss. The court said:

> "The record does not show that prior to the filing of the eminent domain petition the city council had determined, either by resolution or by ordinance, what land was to be taken. [Citation.] Nor does it show that it delegated, or attempted to delegate, to anyone else the power to make that determination. [Citation.] An ordinance enacted on November 18, 1957, after this action was commenced, incorporates by reference a plat that does show the width and course of the proposed extension. It is the city's position, however, that this ordinance 'had and has nothing to do with the condemnation case.'" 16 Ill. 2d at 289-90.

In *Goldman v. Moore* (1966), 35 Ill. 2d 450, 220 N.E.2d 466, a petition to condemn was filed by the Springfield Board of Education before any resolution concerning acquisition of the land in question had been adopted, but after the parties had attempted to negotiate an agreed price. The board passed a resolution almost nine months after the petition to condemn had been filed. That resolution referred to an executive conference held by the board five weeks before the petition to condemn had been filed. The resolution recited that the board had discussed acquisition of the property and had authorized its attorney to proceed with condemnation proceedings, and that at subsequent meetings the board acknowledged the existence of condemnation proceedings instituted by its attorney. The resolution also purported to ratify the action of its attorney in filing the

condemnation proceedings in compliance with the board's oral instruction. The trial judge allowed the defendant's post-trial motion and dismissed the petition to condemn; and the appellate court reversed. It held that the deficiency in the original petition, that is, the absence of an enabling resolution, was cured by the adoption of the formal resolution after the petition to condemn had been filed. *Goldman v. Zimmer* (1965), 64 Ill. App. 2d 277, 212 N.E.2d 132.

The supreme court reversed the appellate court. As it did in *City of Rockford*, the court referred to the argument of the condemning body and pointedly referred to arguments the condemning body had not made.[1] The board did not argue that the formal resolution ratified what had been done at the executive session. Instead, the board argued that the resolution amended the records of the board. The supreme court disagreed on the ground that the resolution did not purport to amend the records of the board, and there were no records of the executive session to amend. At this point we revert back to *City of Rockford*, in which the court pointed out that the condemnor did *not* argue that a subsequent ordinance cured the weakness in the first ordinance.

In *Village of Park Forest v. La Salle National Bank* (1973), 16 Ill. App. 3d 288, 306 N.E.2d 365, the Village of Park Forest adopted Ordinance No. 748 authorizing the acquisition of two parcels of real estate. The village attorney was directed to negotiate for the purchase of the real estate up to a particular price. In the event an agreement could not be reached, eminent domain proceedings were to be instituted. Minutes of the village board's later meetings referred to the acquisition of the "old college site" or the "so-called college site at Monee Road and Indian-wood." *Village of Park Forest*, 16 Ill. App. 3d at 289.

The village filed its petition for condemnation which included the two parcels named in Ordinance No. 748 as well as other property not named. Almost $2^1/2$ months later the village adopted Ordinance No. 765, identical in form to Ordinance No. 748, but adding the additional property which was not specifically described in Ordinance No. 748 but was part of the petition to condemn. The trial judge dismissed the condemnation petition as to the property not specifically described in Ordinance No. 748. The appellate court affirmed the trial court on the ground that Ordinance No. 795 expressly called for its prospective application. The court also rejected the village's argument that the failure to include the additional property in

---

[1]Justice Walter V. Schaefer authored both *City of Rockford* and *Goldman*.

Ordinance No. 748 was the result of a typographical error. It held that the minutes of the village board meetings referring to the "old college site" or the "so-called college site at Monee Road and Indian-wood" (which would include the additional property) could not ne-gate the fact that the ordinance itself specifically described only two parcels of real estate within the "old college site" as being affected. *Village of Park Forest*, 16 Ill. App. 3d at 290.

■ While we express neither agreement nor disagreement with the ultimate finding of *Village of Park Forest*, we point out that the opinion, as well as the opinions of the supreme court in *City of Rockford* and *Goldman*, reflect the view that, when considering whether a resolution or ordinance contains a description of the prop-erty, stringent standards will be applied. Even so, however, a reason-able argument could be made from the language of *City of Rockford* and *Goldman* that an insufficient description of property in an ordinance may be corrected by some other official action by a condemnor representing a clear authorization to condemn the specific property, even after the petition to condemn had been filed. Assum-ing that to be the law for the sake of our discussion, we turn to those subsequent actions of the Authority.

With respect to the Authority's reliance on the authorization by the Authority to its attorneys to commence action to acquire right-of-way that the Village was unable to acquire, we refer again to *City of Kankakee v. Dunn*, in which the city enacted an ordinance which concededly did not describe the property to be taken. After the peti-tion to condemn had been filed, the city council adopted a resolution referring to the ordinance it had previously passed providing for a lo-cal improvement in which the city would acquire a right-of-way across certain private property and "directing that the city attorney file a petition in the name of the city praying that steps be taken to ascertain just compensation to be made for the private property to be taken and to ascertain what property will be benefited by such improvement and the amount of such benefits, or to amend the peti-tion already on file to comply with and accomplish such purpose." *City of Kankakee*, 337 Ill. at 393.

■ The city argued that the applicable statute permitted the city to describe the property to be taken by a subsequent order and that the subsequent resolution cured the defect in the original ordinance. The section of that statute provided that the city might "either in such ordinance or by subsequent order, designate some officer to file a petition in some court of record in the county, *** praying that steps may be taken to ascertain the just compensation to be made for private property to be taken or damaged for the improvement or

purpose specified in such ordinance." (*City of Kankakee*, 337 Ill. at 395.) The supreme court rejected the city's argument on the ground that the section of the statute applied only to procedure and that before that section of the statute would be applicable, a proper resolution and ordinance meeting the requirements of the act must be enacted. Based on *City of Kankakee*, therefore, we reject the Authority's argument that authorization for its attorney to institute condemnation proceedings against *anyone* with whom the Village had been unable to negotiate successfully was sufficient to correct or add to the original ordinance.

■ We turn now to the construction contract into which the Authority entered. In our judgment the construction contract is less a manifestation of authority to condemn a specific piece of property than were the actions of the condemnors in *City of Rockford, Goldman* or *Village of Park Forest*, all of which were held to be insufficient. For these reasons, we must conclude that the trial judge properly granted summary judgment to the defendants and dismissed the petition on the ground that the official actions of the Authority did not manifest an authorization to condemn the property in question.

We recognize that our decision may appear to be based on adherence to an overly technical rule of law. But we repeat the words of the supreme court in *Goldman*:

> "Whether *in this case* a specific evil resulted from this deficiency is beside the point. The procedure followed obviously lends itself to improper conduct on the part of public officials." (Emphasis added.) (*Goldman*, 35 Ill. 2d at 454.)

In our judgment, it is better to adhere to the rule requiring that a condemning body manifest in no uncertain terms the fact that it is authorizing condemnation of a specific piece of property than to set a precedent which would open the door for manifold deviations from the rule. For these reasons, the order dismissing the petition is affirmed.

We deem it appropriate to address the question of good-faith negotiations because it is likely to recur at subsequent proceedings. The Authority concedes that a condition precedent to the exercise of the power to condemn is a good-faith attempt to agree with the owners on the amount of compensation to be paid. *Village of Deerfield v. Rapka* (1973), 54 Ill. 2d 217, 224-25, 296 N.E.2d 336.

■ The defendants argue that the record establishes, as a matter of law, that the Authority did not fulfill its obligation to negotiate in good faith to acquire the property before filing the petition to condemn. The defendants' argument may be summarized:

(1) Homart was the agent of the Authority;

(2) Homart made an offer of $1,556,000; and

(3) The Authority, the principal, made an offer of $1,022,000.

Therefore, because the principal made an offer less than the agent, the principal, as a matter of law, did not negotiate in good faith. The trial judge accepted that argument.

The Authority argues first that the record does not establish, as a matter of law, that Homart was its agent; and, second, that it negotiated in good faith when it offered the full amount of its appraisal report. We agree with the Authority's contention that the judge erred in holding, as a matter of law, that Homart was the agent of the Authority and that the Authority had not negotiated in good faith.

Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has *the right to control the activities of the agent*, and the agent has the power to conduct legal transactions in the name of the principal. (*Gunther v. Commonwealth Edison Co.* (1984), 126 Ill. App. 3d 595, 598, 467 N.E.2d 1104.) We need look no further than the offer made by Homart to establish that an agency relationship did not exist as a matter of law. In that letter, which was sent after the Authority had made its offer of $1,022,000, Homart informed the defendants that it would stand by its offer of $1,556,000. The record is clear that most of the money used for the purchase of the property was to come from Sears. The Authority was obliged in its agreement with the Village to pay no more than $1 million for the construction costs while the Village was liable for $6,500,000. Even after the petition to condemn had been filed, the Authority had no control over Sears in the amount of money Sears would be willing to pay.

Even if we were to assume that Homart was the agent of the Authority, acceptance of the argument of the defendants would mean that once Homart offered the $1,556,000, which was not accepted, the Authority was bound. Such a conclusion would also mean that a principal may not repudiate the offer of an agent even though the offer had not been accepted. This would be contrary to a basic principle of agency law. Indeed, it would be contrary to a basic principle of contract law that an offer may be withdrawn before it is accepted.

Finally, acceptance of the defendants' argument would mean that the Authority itself was bound to offer no less than $1,556,000 and yet we may not consider that $1,556,000 offer, rather than the $1,022,000 offer, in considering whether the Authority negotiated in good faith. Significantly, the defendants do not argue that the $1,556,000 offer is grossly inadequate. (Nor, for that matter, have the

defendants attempted to show that the $1,022,000 is grossly inadequate.) Thus, under the defendants' interpretation of the law, we may not consider the "good" offer, but we must consider only the "bad" offer. In short, the defendants seek to saddle the Authority with the worst of both possible worlds.

The only case cited by the defendants involving negotiations on behalf of a condemnor by a private interest is *Jersey City Redevelopment Agency v. Costello* (1991), 252 N.J. Super. 247, 599 A.2d 899. In that case a private developer entered into an agreement with a public agency to rehabilitate a slum area. Pursuant to the agreement, the developer was empowered to negotiate with owners of property in the blighted area. The developer was negotiating with the owner of one property and later required a leasehold interest in that property. After an award was entered for the taking of the property, the developer filed a claim for part of the award in excess of its purchase price of the leasehold interest. The court, using the language quoted by the defendants here, restricted the developer to recovery of the purchase price. As can be seen, that case is factually wide of the mark here and has no application.

For these reasons, we judge that the trial judge improperly held, as a matter of law, that the Authority had not negotiated in good faith before filing the petition to condemn.

The judgment of the circuit court dismissing the petition is affirmed.

Judgment affirmed.

McNAMARA, P.J., concurs.

JUSTICE ZWICK, concurring:
I agree with the result reached by the majority. I cannot, however, agree with that portion of the majority's opinion relative to the question of the good faith of the Authority's $1,022,000 offer. Under these facts, the trial court correctly found the Authority's offer, which was approximately 66% of the pending Homart offer, to be inadequate and not made in good faith. While recognizing that the question of value is ordinarily one of fact, where an offer such as we have here is so grossly inadequate compared to a pending offer, the question should be properly disposed of as a matter of law.

Value is that which a willing buyer will pay and a willing seller will accept in a voluntary transaction. (See *In re Marriage of Parker* (1991), 216 Ill. App. 3d 672, 575 N.E.2d 938.) As the trial court recognized, no rational seller would accept $1,022,000 from a buyer

for the same commodity for which another buyer is willing to pay $1,556,000. To hold otherwise would be to substitute an artificial rule of law for the time tested and proven commercial practice that the highest bidder wins the sale. I can only ask rhetorically the extent of the hue and cry from the public if a governmental body were to attempt to sell a public asset to a bidder at a price substantially below that bid by another similarly situated party.

If it is assumed, as the majority opinion concludes, that Homart did not act as the Authority's agent, then Homart and the Authority were two separate bodies working in concert to purchase the same property. Under such a circumstance, it is critical to the correct resolution of this case to note that Homart's $1,556,000 offer was still on the table at the time the Authority offered $1,022,000. It is also significant that the trial court specifically found that the Authority knew Homart was offering $1,556,000 for the land at the time it made its inferior offer. Clearly, neither the Authority nor any other reasonable person would expect the defendants to accept $1,022,000 for their property in the face of an offer from another ready, willing and able buyer to purchase the property for more than $1^1/_2$ times the Authority's bid. The Authority, in making its inadequate bid, attempted to adhere to the form required by the law, but failed to conform to either its substance or spirit. Such attempt does not rise to the level of good-faith negotiation.

Under Illinois law, a condemnor's offer may be so inadequate as to constitute bad faith. (*Forest Preserve District v. Marquette National Bank* (1991), 208 Ill. App. 3d 823, 826-28, 567 N.E.2d 635; *Department of Transportation v. Walker* (1980), 80 Ill. App. 3d 1039, 1043, 400 N.E.2d 956; see also *Department of Transportation ex rel. People v. Brownfield* (1991), 221 Ill. App. 3d 565, 569, 582 N.E.2d 209.) Under these facts, I would affirm the trial court on all grounds.