80 N.J. Super. 219 (1963)
193 A.2d 377
IN THE MATTER OF THE APPEAL OF CITY OF EAST ORANGE FROM THE ASSESSMENT OF PROPERTY IN TOWNSHIP OF LIVINGSTON, COUNTY OF ESSEX, FOR THE YEAR 1957, AND IN THE MATTER OF THE APPEAL OF TOWNSHIP OF LIVINGSTON FROM THE ACTION OF THE ESSEX COUNTY BOARD OF TAXATION IN REDUCING THE ASSESSMENT ON PROPERTY OF CITY OF EAST ORANGE SITUATE IN THE TOWNSHIP OF LIVINGSTON, COUNTY OF ESSEX, FOR THE YEAR 1957.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1963.
Decided July 5, 1963.
*221 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Jerome C. Eisenberg argued the cause for appellant, Township of Livingston (Mr. Louis Bort, Township Attorney, and Messrs. Clapp & Eisenberg, attorneys; Mr. Eisenberg and Mr. Harold Friedman, on the brief).
Mr. William L. Brach argued the cause for respondent and cross-appellant City of East Orange.
The opinion of the court was delivered by KILKENNY, J.A.D.
The Township of Livingston appeals from judgments of the State Division of Tax Appeals, filed on February 9, 1962, (a) dismissing petitions of Livingston, and (b) reducing the aggregate assessments for 1957 of water reserve lands in the Township of Livingston owned by the City of East Orange to the sum of $1,238,110.
The City of East Orange cross-appeals, contending that the assessments should be further reduced.
The lands owned by East Orange in Livingston consist of approximately 1471 acres of raw land. About 10% is cleared land and the other 90% is woodland. The land is utilized by East Orange, along with other acreage in adjacent municipalities, to supply potable water to its inhabitants. The land does not contain a reservoir but has beneath its surface an *222 aquifer, i.e., water-bearing strata, which is tapped by means of wells. The subterranean aquifer also extends throughout a substantial part of the Livingston area outside of the water reserve of East Orange and for miles over a good part of New Jersey to the west, north and south of the water reserve.
Livingston assessed this water reserve land for 1957 at a total of $1,734,900. The total acreage was made up of 40 parcels, each listed separately by lot and block number and separately assessed. The total assessment was based on Livingston's determination that the aggregate market value of the land (excluding improvements) was $3,469,800 and to this was applied the local 50% ratio of assessment to value.
Livingston's right to tax this water reserve land is fixed by N.J.S.A. 54:4-3.3 which provides:
"* * *. The lands of counties, municipalities, and other municipal and public agencies of this State used for the purpose and for the protection of a public water supply, shall be subject to taxation by the respective taxing districts where situated, at the taxable value thereof, without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons, but all other property so used shall be exempt from taxation. * * *"
East Orange appealed the Livingston assessment to the Essex County Board of Taxation. The county board fixed the total assessment at $1,314,200, thus giving East Orange a reduction of $420,700. Both Livingston and East Orange then petitioned the State Division of Tax Appeals for a review of the county board judgment, with the result first noted above.
The parties agree that the assessment valuation for 1957 is determinable as of October 1, 1956. N.J.S.A. 54:4-23. Their disagreement is as to the proper method to be employed in making the evaluation. Livingston contends that the land must be valued "in the condition in which the owner holds it," as a watershed in this case, with a substantial aquifer which has a value, irrespective of the surface use of the land. It complains that it was precluded by the State *223 Division from introducing evidence as to the nature and extent of the aquifer for the purpose of developing by expert testimony a capitalized value for the water reserve lands on the basis of a public utility in the water supply business.
East Orange, on the other hand, argues that Livingston's approach is fundamentally contrary to the legislative intent that this property should be assessed "at the taxable value thereof * * * in the same manner and to the same extent as the lands of private persons." N.J.S.A. 54:4-3.3. It maintains that Livingston's attempt to impose a special, peculiar and unique form of assessment on these water reserve lands, based on the valuation of subterranean water rights, is contrary to constitutional and statutory assessment principles. East Orange contends that the property is zoned residential AAA, in which zone buildings are limited to one home per acre, and "true value" can be determined only by a finding as to what a real estate developer would pay for the 1471 acres, purchased as a single entity, "at a fair and bona fide sale by private contract," in their present state and for the purpose of building homes thereon.
N.J.S.A. 54:4-23 requires the assessor to "determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments."
Livingston counters with the argument that the approach of East Orange is inconsistent with the realities of the situation because this land will not in the foreseeable future ever be utilized for residential development, since that would interfere with the highest and best use of this land as a watershed. Accordingly, Livingston would have us discard as irrelevant the testimony of the real estate experts for East Orange, who based their valuations upon what the land would bring if used for a residential development, which was their opinion of its most readily feasible and highest economic use from the standpoint of a purchaser in the open market.
*224 The parties agree that the division of the land into lots and blocks as assessment units is purely artificial and that the tract should be valued as a whole. It is admitted that Livingston's zoning regulations will not permit a building to be erected where the mesne elevation above sea level is less than 176 feet. About 340.59 acres are below that minimum level. The municipal AAA residential zoning herein means that a building plot must have a frontage of at least 150 feet and a depth of at least 235 feet, each house being required to have at least one acre of ground.
Each side produced experts in real estate values, who gave their varying opinions as to what these lands were worth as of the assessment date. The State Division applied, with some modifications, the formula established by Franklin Hannoch, a well-qualified expert called by East Orange. Mr. Hannoch used the approach of analyzing sales of large tracts in the area, purchased for residential development and, in one instance, by Commonwealth Water Company, in the several years prior to the assessment date. He figured market value without regard to what one particular customer, such as a water company, might pay for the tract. His appraisals set forth varying acreage values depending upon the differences in the elevations above sea level of the several parcels and on their condition as wooded or cleared or under water. For example, he gave no value to 60.9 acres under water. As to the other lands, Mr. Hannoch used the following acreage value formula:

 Under 170' ........................... $500
 Between 170-175' ..................... 750
 Between 175-180' ..................... 1000
 Between 180-185' ..................... 1500
 Over 185' wooded ..................... 2000
 Over 185' cleared .................... 2500

Mr. Hannoch expressed the view that each of the foregoing values would be subject to a discount adjustment of 35% because a buyer of such a large tract, sold as an entity, would expect such a discount since his capital would be tied up a *225 long time due to delays in marketing such a large tract in a local market, whose ability to absorb new development would be limited. He estimated, on the basis of past experience in Livingston, that it would take 15 years to dispose of the entire 1500 acres, calculating a sale of 100 homes and acres a year. Mr. Hannoch testified that this would make the discount price 65% of true value according to the "Inwood tables" used by appraisers. Therefore, in arriving at his final total appraisal of $1,565,671, this real estate expert computed the acreage in each of the above classifications and multiplied by the value per acre, as adjusted by the 35% discount.
In arriving at its final computation, the State Division accepted the Hannoch formula of valuation, but without adjustment for the 35% discount, and arrived at a true value of $2,408,720. To that sum it added $34,500 for the 60.9 acres under water at $500 per acre, the minimum acreage price fixed by Mr. Hannoch, on the theory that this land has "a great deal of value for the drainage of the entire area from surface water." It added another $40,000 by reason of the fact that some 330 feet of the land were in the business district and had been valued by Mr. Stolese, a realtor witness for Livingston, at $150 a foot, the difference between the value placed upon it by Hannoch and the value placed upon it by Mr. Stolese amounting approximately to $40,000. These two additions, amounting to $74,500, increased the true value from $2,408,720 to $2,483,220, according to the State Division's determination. The Division then deducted $7,000 therefrom because Mr. Hannoch's computation was based on 1485.59 acres, but subsequent resurveying showed 14 acres less, or 1471.59 acres. These 14 acres at the lowest value figure of $500 per acre established the $7,000 deduction and made the Division's net true value figure $2,476,220. Applying the 50% ratio, the assessment was fixed by the Division at $1,238,110.
No useful purpose would be served by a detailed review of the corroborative testimony of George Goldstein, the other *226 expert real estate appraiser called by East Orange, who appraised the acreage in issue at a total value of $1,285,100. Suffice it to say that he employed the "comparable sales" technique in arriving at his opinion, based upon sales of tracts of 50 acres or more of the same general character in the neighborhood of these water-reserve lands. He ascribed no additional value to the land because of any subsurface utilization or to the fact that it was held as "watershed property." He also subscribed to the view that the sale of this tract of almost 1500 acres "as one entity" in the Livingston market where the absorption possibility is approximately one hundred acres or new homes per year would make the wholesale price for the entirety about one-third less than what the aggregate of retail prices would be.
Nor need we consider at length the conflicting opinions of Livingston's appraisal witnesses. Its expert, Frank Stolese, valued the land at $4,310,094. His method consisted in assigning to each of the several parcels a value per front foot, calculated upon a depth of 235 feet as required by the zoning ordinance, and then giving to the acreage left over in the rear a per acre value depending upon topographical conditions. His front-foot value varied from $20 to $50, and the acreage from $300 to $3000. Where the parcel had no frontage, he ascribed to it only a per acre value. The State Division noted that Mr. Stolese was a local broker, was not a member of any appraisal societies, and had not done appraisal work to any extent comparable to that of the city's experts. While he based his appraisals on comparable sales, his experience was generally confined to tracts of less than 50 acres. As Commissioner Gotshalk, the hearing commissioner, correctly summarized Stolese's testimony in his opinion:
"He had a tendency to emphasize this type of sale [less than 50 acres] rather than considering the acquisition cost of a large tract of land as a whole. The land in question is good or bad as are most big tracts and one cannot pick out a particular sale of a small tract usable for building and use that as a comparable sale."
*227 The State Division did accept two views expressed by Mr. Stolese which conflicted with those expressed by the experts for East Orange. The latter had listed as valueless some 60.9 acres under water, whereas Stolese asserted these acres had value for drainage purposes. The State Division agreed with Stolese and placed a value of $500 per acre on these under the water acres. However, the Division made a mathematical error in arriving at its figure of $34,500. The correct figure should be $30,450. As modified, we agree with the Division as to this item.
The State Division also accepted Stolese's value of $150 per front foot on some 330 feet of the water reserve land located in a business zone across the street from a gas station and a real estate office. This was about $40,000 in excess of the value placed on this land by the city's experts. Stolese admitted that, in fixing his per front foot value of $150 on this parcel, he did not rely upon comparable sales of lands zoned for business purposes. East Orange properly points out that Stolese's formula would place a value in excess of $60,000 per acre on this small parcel, while the highest value per acre on the rest of the land, as testified by its experts, is only $2500 an acre. On its face, the determination by the Division as to this small parcel is not supported by proper or credible evidence and it was, therefore, erroneous to add this $40,000 to this city's assessment.
Livingston's other expert real estate appraiser, C. Sanford Krasner, valued the surface of these lands at $2,004,000. He made no attempt to appraise the subsurface property rights. In reaching his figure, he assumed a threefold prospective use of the surface. First, he hypothesized that two public golf courses, each with 150 acres, could be placed upon the land, for which someone might pay $2000 an acre for the raw land, thus yielding $600,000 for 300 acres. Secondly, he advanced the idea that a public park or wildlife preserve could be created and the establishment thereof could utilize 300 acres of low, wet land and 691 acres of dry and higher land. He estimated that the low land might yield $400 an acre, or *228 $120,000, and the higher property $700 an acre, or $484,000. This expert finally anticipated the use of 34,300 feet fronting on existing streets for the erection of dwellings, which purpose, allowing for the required zoning depth, would use up the remaining 180 acres. He calculated that at an average of $23.30 per front foot, the yield from this third use would be $800,000.
These assumptions of Mr. Krasner are very speculative and unrealistic and his opinion of value based thereon is not convincing. The lands in issue are zoned AAA residential and, presumably, may not be used for public golf courses. There was no specification of the particular acreage which would be devoted to this purpose, so that his value of $2000 an acre is theoretical at best. He had no previous experience in appraising the value of golf courses or of the cost of building and operating the same. He relied upon book information quoting national statistics. There was no suggestion as to what public body might be interested in creating the public park or wildlife preserve, none having thus far indicated any interest in doing so.
In brief, the opinion testimony as to the value of these lands given by the expert real estate appraisers produced by East Orange was much more realistic and convincing than that of Livingston's similar experts, as the State Division found.
However, we agree with the State Division that the deduction for allowance of discount from a sale price of the 1471 acres as an entirety, as advocated by the city's experts, is not justifiable in the appraisal of this land for the purpose of taxation. We deem Newark v. West Milford, 9 N.J. 295 (1952), controlling on this issue. There, the municipally-owned water reserve land consisted of 18,548 acres. The Supreme Court pointed out that N.J.S.A. 54:4-3.3 intended an equitable apportionment of the tax burden to the end that neither the municipal owner of the watershed nor the generality of taxpayers in the taxing district should be subjected to a disproportionate share thereof. While recognizing *229 that such a large tract must be valued as an entirety, as held by the owner, it noted the practical impossibility of the sale of such a vast tract and that a valuation "on a theoretical sale basis would in all probability result in a valuation much lower than the value of the aggregate of comparable lands of private persons." 9 N.J., at p. 302. To avoid a disproportionate share of the tax burden being visited upon the other taxpayers in the district, it stated, 9 N.J., at p. 308, that the true value of Newark's watershed lands would have to be determined "by comparison of the representative component parts of the various classifications of the lands * * * with the true value of comparable parcels of land owned by private persons adjacent to the watershed or reasonably nearby in the township," measured by fair sale value.
We understand Newark v. West Milford as meaning that the tax valuation of a large tract of municipally-owned watershed land is not to be arrived at on the basis of what it would sell for in the entirety, in a single sale, to a single hypothetical purchaser, but rather what appropriate marketable segments thereof, analogous to private holdings of similar lands by others in the community, would sell for in the aggregate if sold separately by fair sale under private contract. This approach clearly sustains the propriety of the State Division's determination in disregarding the discount factor on the hypothetical sale of the entire East Orange holdings to one purchaser by single sale.
We turn now to Livingston's contentions that the value of the aquifer is a factor requiring consideration, in determining the value for taxation of this municipally-owned water reserve property, and that erroneous trial rulings by the hearing commissioner wrongfully prevented its establishment of the value of this aquifer. Syllogistically expressed, Livingston's argument seems to be as follows: All land must be valued for taxation in the condition in which it is held by the owner. East Orange holds this land as a watershed with a valuable subterranean aquifer. Therefore, this land must *230 be valued for taxation as a watershed with its valuable subterranean aquifer. To this argument, Livingston adds that computing the value of the land for residential development is unrealistic because East Orange will not, in the foreseeable future, ever dispose of it for that purpose because of its greater utility and value as a source of potable water.
The cases do say that land must be valued "in the actual condition in which the owner holds it." Colwell v. Abbott, 42 N.J.L. 111, 115 (Sup. Ct. 1880); Newark v. West Milford, 9 N.J. 295, 304 (1952); Delaware L. & W. Railroad Co. v. Hoboken, 16 N.J. Super. 543, 570 (App. Div. 1951), reversed on other grounds 10 N.J. 418 (1952); Stack v. Hoboken, 45 N.J. Super. 294, 299 (App. Div. 1957); Division of Tax Appeals v. Ewing Tp., 72 N.J. Super. 238, 243-244 (App. Div. 1962).
This general rule must be properly understood and is not without qualification. In Colwell v. Abbott, involving taxation of 3810 acres of wild land, it was used to mean that in valuing land for taxation, "if held by the owner as a farm or as an entire tract, the question is not what this or that part would sell for, if separated from the rest, but what would the property as it is  as the owner actually holds it  sell for at a fair private sale?" (Emphasis added) 42 N.J.L., at p. 115. So understood, the question as to these 1471 acres is not what this part or that would sell for but what the property "as a whole" would sell for at a fair private sale. In Newark v. West Milford, the rule was expressed as "what the whole thing would bring in private sale, since the land must be valued in the exact condition that the owner holds it." (Emphasis added) 9 N.J., at p. 304. However, as noted above, the Supreme Court modified this concept to avoid a disproportionate share of the burden of taxation falling upon the other taxpayers. Delaware, L. & W. Railroad Co. v. Hoboken, 16 N.J. Super., at p. 570, qualified the rule by stating, "While property should be valued for taxation on the actual condition in which the owner holds it, * * * its value in that condition is *231 affected by what can be done with the property." In Stack, we noted that, in assessing the value of land, account should be taken not only of its actual use and physical condition, but also of interrelated uses connecting it with other property. In Division of Tax Appeals v. Ewing Tp., the subject property had been held and used as a farm. We held that its use as a farm would not preclude the tax assessor from considering "the possibility of sale to a buyer who intends a different use, unless such possibility is so remote as to have no real bearing upon current value." 72 N.J. Super., at p. 243.
As a general proposition, all of the natural attributes of a parcel of real estate may properly be given consideration in arriving at its true value for tax purposes, the presumption being that the willing buyer and the willing seller in a hypothetical sale would themselves have all such attributes in mind in coming to a conclusion as to what their bargaining position should be and what price they should pay or accept in arriving at a fair sale. "The fact that a tract of land is underlaid with a valuable seam of coal having a market value would influence the mind of a probable purchaser." Washington County v. Marquis, 233 Pa. 552, 82 A. 756 (Pa. Sup. Ct. 1912).
In the instant case, the actual physical condition of the tract held by East Orange includes its subterranean water-bearing strata and the consequent potential of the property for profitable water development purposes. However, the fact that the property is now actually being used as a water supply project calls for no special increment of value to such valuations as might otherwise be arrived at. It is the fitness and availability of property for particular uses which should be given consideration in arriving at its taxable value, rather than the fact of actual use as such. See Delaware, L. & W. Railroad Co. v. Hoboken, supra, 16 N.J. Super., at p. 563; Long Dock Co. v. State Board of Assessors, 78 N.J.L. 44, 53 (Sup. Ct. 1909), affirmed 79 N.J.L. 604 (E. & A. 1910); cf. Currie v. Waverly, etc., R.R. Co., 52 N.J.L. *232 381, 395 (E. & A. 1890). See also Division of Tax Appeals v. Ewing Tp., supra.
Much of Livingston's proffered proof with respect to the value of the property as a water project or enterprise is based not on the value of the land itself (even including the subterranean water resources), but the value and profitability of a commercial enterprise's using such lands for water distribution purposes. The latter is clearly enterprise value rather than land value. Obviously, elements of value which pertain to managership and integration of the land into a going water utility have no place, or at least only a remote connection, with the determination of the value of the land itself as between a hypothetical buyer and seller, neither of whom necessarily has to be regarded as a water utility. See Jersey City v. Harborside, etc., Inc., 19 N.J. Misc. 222, 229-231 (Bd. Tax App. 1941), certiorari dismissed 128 N.J.L. 263 (Sup. Ct. 1942), affirmed 129 N.J.L. 62 (E. & A. 1942). A good deal of the expert testimony offered by Livingston to establish value from a water operational standpoint was so closely interwoven with water enterprise valuation, as distinguished from the value of the raw, water-bearing land itself, as to make such proofs at best of speculative and remote probative weight in determining the true or market value of the land alone, which is the criterion which under our cases must control the determination of the taxable value of real property.
The evidence indicates that much vacant land in North Jersey possesses, as does the property in question, subterranean water-bearing strata. Since, as indicated above, it is the availability or fitness for special uses, rather than the fact of actual use for a special purpose, which should be taken into account in determining taxable value, it is clear than in any litigation involving the taxable value of such lands not currently devoted to water utility purposes, the argument might be made, with as much legal justification as here, that evidence should be admitted and given consideration as to the economic productivity of the land from the standpoint *233 of its availability as a water supply utility. It is obvious that in the average such case the probative weight of such proof would be extremely remote and of minimal degree in comparison with evidence of the value of the property in the light of its availability for such more and likely common uses as residential development, industrial utility, farming and commercial enterprises.
It may, therefore, be fairly concluded in the present case that the Livingston proofs based upon water enterprise value bore such little probative weight, if any, on the ultimate issue of the market value of the property for any of the more likely common uses of such lands, that the disregarding thereof by the Division of Tax Appeals and its proceeding in the valuation process along more conventional lines visited no prejudicial error upon Livingston.
Also significantly bearing upon Livingston's contention that the property should be valued as a water utility is the construction of the special effect of N.J.S.A. 54:4-3.3 by the Supreme Court in Newark v. West Milford, supra. The statute expressly declares that such lands shall be subject to taxation, at the taxable value thereof, "without regard to any buildings or other improvements thereon, in the same manner and to the same extent as the lands of private persons." Newark v. West Milford, 9 N.J., at p. 302, states:
"The statute impliedly prohibits an assessment of such lands as part of an integrated utility with the resultant increment to the value of such lands because of their integrated use. An assessment on such a basis necessarily would result in a higher valuation and would burden the municipality owning the watershed property with a disproportionate share of the tax burden of the taxing district."
The Supreme Court laid down this rule of guidance (9 N.J., at p. 303):
"The lands here in question cannot be sold by private contract, and because of the vast acreage involved there are few if any comparable holdings in the hands of private persons. So it follows that the assessment of these lands cannot be fixed with any degree of mathematical exactness but must be fixed by a reasonable and equable comparison with the true value of smaller comparable holdings of *234 private persons. A reasonably approximate and comparable true value based upon the same principles of taxation applicable to these holdings of private persons will be a compliance with the statutory direction."
The central concept in Newark v. West Milford is that N.J.S.A. 54:4-3.3 precludes a valuation approach based upon any special factor of value inhering in the property as devoted to integrated water utility purposes because other lands in the municipality are not being used for such purposes and the municipally-owned water supply lands must be assessed in the same manner as comparable land of the generality of real estate taxpayers in the taxing district. Therefore since, as indicated above, the influence upon the assessable valuation of the lands of taxpayers generally of the fact that they contained subterranean water-bearing strata would in ordinary course exert very little influence on the true or market value of the property, the same conclusion must be arrived at for purposes of determining the true or assessable value of the property of East Orange in this case.
We find no substantial merit in Livingston's claims that it was prejudiced by trial rulings which prevented three of its experts from testifying as to the aquifer and precluded its establishing the productivity of the aquifer underlying the subject property. We need not repeat the reasons noted above which constituted justification for the hearing commissioner's disallowance of Livingston's valuation approach as to the aquifer, based on productivity and enterprise value. The following excerpts from the Division's opinion demonstrate additional reasons why there was no abuse of discretion in rejecting the testimony of the three experts in question:
"Livingston also offered an engineer associated with the firm of Metcalf and Eddy, one E. Sherman Chase. Mr. Chase was a man of great age who had been employed by many public bodies largely in pollution control. As a partner in the firm, he had supervised sewage treatment plans of various kinds, had at one time surveyed the State of Rhode Island for the purpose of cataloging the various sources of its water supply. Actually he had done no work in connection with water in New Jersey although he had handled sewage problems. He had never had an occasion to value any water rights *235 especially potable water. The nearest he had come to this was sometime in 1942 he had represented some manufacturers whose water for processing was diverted by the State of Massachussets as part of its water supply in their suit for damages. Obviously the damages in that case would have little concern with the evaluation in dollars and cents of a supply of potable water in the ground, and as this valuation was material to the case, accordingly we refused to permit this witness to testify as one qualified to testify in dollars and cents on the ground that whatever he did would be pure guesswork.
When this witness was refused, tentatively as not being qualified, a geologist, Professor Martens and another engineer, a Mr. Anderson, were offered as witnesses on the subjects, respectively of geology of the area and the evaluation of the water reserves as a supply of potable water. This case has been pending for several years. There was a lengthy correspondence between the parties in which each agreed to furnish the other with a list of experts and a summation of their testimony. There was a pretrial conference at which this feature of the case was emphasized. These latter witnesses Anderson and Martens were two witnesses whose names were not given to the other side until the middle of the trial. Counsel for Livingston claimed that it was so very difficult to obtain expert witnesses that it had taken two years to get his case ready, yet oddly enough he obtained two of them within 48 hours after Mr. Chase was disqualified. These witnesses were not permitted to testify. According to the regulations of the Division of Tax Appeals, pretrials, depositions and interrogatories are permitted and our practice and procedure conforms to the state court system. See Rule 16:8-13.100, 16:8-14.00, 16:8-21.00. It was ruled that it would be extremely unfair to permit these witnesses to testify in view of the fact that if as counsel for Livingston stated it took two years to get his witnesses, it might take a protracted period for East Orange to obtain adequate rebuttal. Adjournment was also refused in view of the age of the case and the above number of previous adjournments."

CONCLUSION
The aggregate assessment of $1,238,110 for 1957, arrived at by the State Division, will be modified by deducting therefrom $22,025, thereby reducing it to $1,216,085. This deduction represents 50%, the local ratio, of the $40,000 additional assessment erroneously placed on the small parcel, two-thirds of an acre, in the business Zone and of $4050, to correct the mathematical error in computing the value of 60.9 acres under water at $500 an acre, as noted above.
As so modified, the judgments of the State Division are otherwise affirmed.