252 N.J. Super. 247 (1991)
599 A.2d 899
JERSEY CITY REDEVELOPMENT AGENCY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JOHN B. COSTELLO AND ANN W. COSTELLO, HIS WIFE, ET AL., DEFENDANTS-RESPONDENTS. JERSEY CITY REDEVELOPMENT AGENCY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN B. COSTELLO AND ANN W. COSTELLO, HIS WIFE, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1991.
Decided March 13, 1991.
*250 Before Judges J.H. COLEMAN, DREIER and LANDAU.
John J. Curley argued the cause for appellant/respondent Jersey City Redevelopment Agency (Lepis, Lepis & Curley, attorneys, John J. Curley, on the briefs).
Dennis J. Drasco argued the cause for respondents/appellants John B. Costello and Ann W. Costello (Lum, Hoens, Conant, Danzis & Kleinberg, attorneys, Dennis J. Drasco of counsel, Dennis J. Drasco, Steven F. Ritardi and Christine M. Nugent, on the briefs).
Ronald E. Wiss argued the cause for respondent/cross-appellant Newport Associates Development Company (Wolff & Samson, attorneys, Ronald E. Wiss, on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
These back-to-back appeals[1] arise from a condemnation action commenced by Jersey City Redevelopment Agency (JCRA) *251 against John B. Costello and Ann W. Costello (Costellos), owners of approximately 15.25 acres of property located on the Hudson River waterfront in Jersey City. The Costellos obtained a jury award in the amount of $6,750,000 from which JCRA now appeals.
Following the entry of that final judgment, allocation hearings were conducted to determine what portion of the condemnation award Newport Associates Development Company (Newport) was entitled to receive as assignee of Chicago Shippers Association's (CSA) leasehold interest in the subject property. The trial court determined that the value of Newport's leasehold interest was $2,360,000. The Costellos appeal and Newport cross-appeals from that determination.[2]
The Costellos' property is located in an I-2 Intensive Industrial Zone, an area which permits a variety of uses, including office buildings, hotels, commercial development, shopping centers and truck terminals. Constructed upon this property was a truck/rail terminal, ancillary office building, and a pier sustaining a bulkhead capable of producing income from the rental of space to tie up vessels. In addition to using the terminal to conduct their business, U.S. Packing and Shipping, the Costellos also leased the facility to CSA, a freight consolidator.
CSA negotiated a twenty-year lease with the Costellos which commenced on February 17, 1978. Rent was fixed significantly below market value in light of a mutually beneficial agreement related to their freight businesses whereby CSA provided the Costellos with the capital to purchase the subject property, while the Costellos were to have the burdens, risks and benefits of ownership.
In July of 1981, JCRA, which was engaged in rehabilitation, reconstruction and clearance of slum and blighted areas in Jersey City, entered into a redevelopment contract with Newport *252 pursuant to N.J.S.A. 40:55C-1, et seq., and in accordance with the statute designated Newport as its exclusive redeveloper of the "Harbourside Redevelopment Plan." Pursuant to the terms of the Agreement, Newport was empowered to negotiate with owners of properties within the area so as to effectuate acquisition and avoid litigation. In the event negotiations proved unsuccessful, Newport was to notify JCRA and request that condemnation proceedings be instituted. In the event of condemnation, the Agreement required Newport to pay as the purchase price for any such property all costs of acquisition and relocation.
In 1981, the Costellos were notified by JCRA and thereafter by the Glimcher Company[3] that their property was the subject of a redevelopment project. Pursuant to the terms of its Agreement with JCRA, the redeveloper sought to negotiate a purchase of Costellos' property. The negotiations were not successful, and an N.J.S.A. 20:3-6 condemnation proceeding commenced. As a result thereof, the Costellos began negotiations with CSA to purchase its leasehold interest in the subject property. In this regard, the Costellos contend that the parties drafted an agreement whereby CSA would receive between $1,000,000 and $1,450,000, depending upon the amount of the condemnation award.
In June of 1985, Newport began its own direct discussions with CSA, either seeking to satisfy its obligation to conduct negotiations as JCRA's redeveloper, or possibly, as the Costellos allege, to destroy the deal they formulated with CSA. As a result of these negotiations, Newport purchased a lease assignment from CSA for $1,250,000.
On March 8, 1985, JCRA commenced condemnation proceedings against the Costellos' property pursuant to the "Eminent Domain Act of 1971," N.J.S.A. 20:3-1, et seq. Condemnation *253 commissioners were appointed and upon conclusion of their hearing, determined the fair market value of the property was $3,200,000. The Costellos appealed this determination to the Superior Court, and JCRA cross-appealed.
A key issue presented to the trial court concerned the highest and best use of the subject property for the purpose of determining fair market value as of March 8, 1985. In this regard, JCRA's expert, William Stack (Stack) testified that the property's highest and best use was as a truck terminal. In support of his opinion, Stack noted: 1) there was practically no commercial or residential development of the surrounding area as evidenced by an adjacent tugboat repair facility, as well as a number of parcels of land devoted primarily to industrial, warehousing and transportation-related uses; and 2) vehicular access to the property was compatible only with the property's existing use. Utilizing the sales comparison and income capitalization approaches, Stack determined that the property was valued at $2,425,000 and $2,096,500, respectively. Stack concluded that the fair market value, based upon a reconciliation of these two approaches, was $2,100,000.
Costellos' two experts, Jon P. Brody (Brody) and Robert W. Hendricks (Hendricks), however, anticipated the change in the highest and best use of the property from its existing use to future commercial development. Testifying in terms of "long-term eventual use of property for development," Hendricks opined that the property's current use was an "interim use" and that its anticipated highest and best use was for future commercial development. Hendricks determined that the fair market value of the property for its current use was $6,350,000 based upon a sales comparison and income capitalization approach. Hendricks also projected future appreciation in the value of the land and pier rising to $20,344,000 ten years after the date of valuation. In doing so, Hendricks added the present worth of the future value to the discounted value of the cash flow for the interim ten years. His opinion of fair market value on this basis was $8,600,000.
*254 Brody, employing the sales comparison, income capitalization and replacement cost approaches, determined that the fair market value for the property's current use was $8,100,000. After a Rule 8 hearing, however, the trial judge barred from evidence Brody's proposed testimony that the property was worth $13,600,000, a value based upon an adjustment "increment" which was intended to take into account the future development potential of the property.
Both Brody and Hendricks testified that in arriving at their respective valuations, each considered a 1984 Master Plan depicting the rejuvenation, future use and development trends of the Hudson River and Jersey City waterfront. JCRA, objecting to the admission of this plan into evidence, alleged that the Redevelopment Project predated the 1984 Master Plan. Because this Plan purportedly incorporated the land use planning objectives of this massive redevelopment project, JCRA argued that its admission was a back-door means of introducing JCRA's own redevelopment activities before the jury.[4] JCRA's expert said he did not ignore the development trends of the Hudson River waterfront in establishing value, but he did not consider the 1984 Master Plan in that assessment.
In the allocation proceeding, Newport and the Costellos presented expert testimony regarding the value of the leasehold interest. Newport's expert, Eugene Albert, based his appraisal on the total condemnation award of $6,750,000, determining that the present value of the leasehold was $3,625,000. The Costellos' expert, Hendricks, based his appraisal on market data utilizing fair rental values. Subtracting operating expenses and reducing the award to present value, Hendricks opined that the leasehold was worth $1,082,000. Although the trial judge adopted Hendricks' appraisal method, she did not arrive at the same result. Specifically, the trial judge "accepted" *255 that the property had a "net rental value" of $550,000 in 1985.[5] Factoring into her analysis the lower actual rental paid by CSA, expenses and the worth of the rental advantage, the trial judge determined that Newport (as successor to CSA) was entitled to $2,360,000 of the condemnation award for the value of the leasehold.

THE JURY AWARD
In its appeal from the jury award, JCRA contends that the expert opinion testimony and appraisal methods offered by the Costellos invited the jury to speculate improperly as to the future development potential of the subject property and arrive at an award based upon pure conjecture; that the trial court erroneously allowed a highly prejudicial and misleading sale to be placed before the jury; that the jury's ultimate determination was improperly influenced by their viewing the site; and that the verdict was contrary to the weight of the evidence.
Initially, we find that these arguments have no merit and that the jury award was adequately supported by evidence in the record. R. 2:11-3(e)(1)(B). See also State v. Silver, 92 N.J. 507, 514-515, 457 A.2d 463 (1983); Township of Wayne v. Kosoff, 73 N.J. 8, 372 A.2d 289 (1977); Dolson v. Anastasia, 55 N.J. 2, 258 A.2d 706 (1969); Hartpence v. Grouleff, 15 N.J. 545, 105 A.2d 514 (1954); State Highway Comm. v. Lincoln, etc., Corp., 110 N.J.L. 190, 164 A. 476 (E. & A. 1933); State v. Azzolina Land Corp., 101 N.J. Super. 103, 108, 243 A.2d 276 (App.Div. 1968); Moorestown Tp. v. Slack, 85 N.J. Super. 109, 114, 204 A.2d 23 (App.Div.), certif. denied, 43 N.J. 452, 205 A.2d 444 (1964); In re Appeal of East Orange, 80 N.J. Super. 219, 193 A.2d 377 (App.Div.), certif. denied, 41 N.J. 200, 195 A.2d 468 (1963); State by State Highway Com'r v. Gorga, 54 *256 N.J. Super. 520, 527, 149 A.2d 266 (App.Div. 1959); N.J.S.A. 2A:77-1; R. 4:73-7.
We add the following comments as to valuation of the Costellos' property. Credible expert testimony supported a determination that as of the valuation date, land uses on the waterfront were known to be trending toward the higher and better "Gold Coast" developments rather than the prior conventional terminal uses. Reference to the September 1985 Morris sale, six months after the valuation date, was properly made and received as evidence of the growing trend, as well as because of its similarity and relative closeness in time. Although it was argued that the Newport development was itself responsible for the high Morris value six months later, the trial judge properly exercised her discretion to permit this evidence to be considered by the jury. Market values could well have increased as a result of the increasingly intense development activity along the waterfront, and it was not error to admit the Morris sale simply because the Newport project, for which the property was condemned, was itself part of the development trend.
Additionally, we note that even on the basis of capitalizing income from use as a truck terminal and bulkhead facility, there was expert testimony to support the $6,750,000 value found by the jury.

ALLOCATION
As to the allocation proceeding, the Costellos assert that § 502 of the lease agreement with CSA does not provide a basis for Newport to share in the condemnation award; that bad faith negotiations, contractual interference and land speculation prevent Newport from recovering an amount in excess of the price it paid for the lease assignment; and that the allocation should have been based upon a comparison of economic rent as determined at the commencement of the lease and the date of taking. Newport cross-appeals, asserting that the trial court *257 failed to consider the present value of the tenant's option to buy.
It is without question that the government has an overriding obligation to deal forthrightly and fairly with property owners in condemnation actions. F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426, 495 A.2d 1313 (1985); see also State by Com'r. of Transp. v. Carroll, 234 N.J. Super. 37, 559 A.2d 1381 (App.Div.), certif. granted, 118 N.J. 197, 570 A.2d 961 (1989); State by Commissioner of Transp. v. Hancock, 210 N.J. Super. 568, 510 A.2d 278 (App.Div. 1985). In this regard, our Supreme Court has held:
It [the government] may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another.
F.M.C. Stores, 100 N.J. at 427, 495 A.2d 1313.
These principles apply with equal force where government designates a private developer to negotiate an acquisition. Once a proper declaration of blight is made, see N.J.S.A. 40:55-21.10, the governing body may, by resolution, agree that a private or public enterprise, or a combination of both, be chosen to undertake the redevelopment project pursuant to a comprehensive plan either created or approved by it. See N.J.S.A. 40:55C-2 and N.J. Const. Art. 8, § 3, ¶ 1. Indeed, the public interest may be better served by a private enterprise rather than a governmental entity. See Berman v. Parker, 348 U.S. 26, 33-34, 75 S.Ct. 98, 102-103, 99 L.Ed. 27, 38 (1954). However, when Newport stepped into JCRA's shoes to perform those functions which JCRA would have otherwise performed itself, Newport became the vehicle of the JCRA through which the public purpose was to be accomplished, pursuant to the terms of the redevelopment agreement. See Levin v. Tp. Committee of Tp. of Bridgewater, 57 N.J. 506, 543, 274 A.2d 1, appeal dismissed, 404 U.S. 803, 92 S.Ct. 58, 30 L.Ed.2d 35 (1971); Wilson v. Long Branch, 27 N.J. 360, 376, 142 A.2d 837 *258 (1958), cert. denied, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958). Newport must be held to the same or similar standards as that of the condemning authority. While it would be expected to seek to profit from the development, it was not free to speculate for its own account in property interests which were part of the very property it was allowed to acquire. Section 9A of the Redevelopment Agreement specifically states:
A.) Representations as to Redevelopment. The Redeveloper represents and agrees that its purchase of the property, and its other undertakings pursuant to the Agreement, are, and will be used, for the purpose of redevelopment of the property and not for speculation in land holding. (Emphasis supplied.)
Although the terms of the Agreement precluded land speculation, Newport purchased CSA's leasehold interest for $1,250,000 and now seeks to realize a $1.1 million gain through the allocation proceeding. The obvious litigational and tactical advantage Newport received at the time of the allocation proceeding was candidly admitted to by the redeveloper's representative, Thomas Domagala, wherein he testified:
Q. Okay. Mr. Domagala, isn't it true the reason you paid $1,250,000 for the tenant's interest was the very practical advantage you retain in becoming the assignee of Chicago Shippers and a codefendant in the condemnation case?
A. It certainly is an advantage, yes.
Q. Isn't it true that an essential part of the willingness to negotiate and your desire to purchase the interest was as a hedge against the condemnation award and what it might be?
A. Ultimately if the award were much greater than the initial fair market value determined, it could be a beneficial factor.
Q. It had very beneficial tactical advantages for Newport to do what it did; is that right?
A. Correct. Sure.
Q. For the tactical advantages you wouldn't bother to pay the money, you would have waited until the case was over?
A. If Chicago Shippers had a lease that had three months left on it, it would have no value.
Q. I didn't ask you that question. My question was if it were not the tactical advantage you just referred to, you would not have been interested to advance $1,250,000 back in 1985 when you knew the case wasn't coming in two or three years?
A. It was a determination made Chicago Shippers had a value in leasehold interest and that's why we proceeded.
*259 Our review of the record in this regard reveals that Newport's actions do not comply with the standards of fair dealing to which JCRA and it were bound. Under the Redevelopment Agreement, Newport was to act in the public interest, not as a private land speculator vying for a piece of a condemnation award.[6] In light of its overriding obligation under the authority delegated by JCRA to deal "forthrightly and fairly" with the Costellos, and because of the need to avoid even the appearance of a conflict of interest, we find that Newport is not entitled to an allocation which permits it to recover more than the purchase price it paid to CSA for the leasehold interest.
Which party then is entitled to receive the $1,110,000 representing the difference between the amount paid by Newport to CSA and the fair market value of the leasehold interest as determined by the trial judge? Condemnation procedures in New Jersey follow the "unit rule" which allows only one award to be made for all the separate interests in the property. State v. Jan-Mar, Inc., 236 N.J. Super. 28, 563 A.2d 1153 (App.Div. 1989); N.J. Highway Authority v. J. & F. Holding Co., 40 N.J. Super. 309, 314-315, 123 A.2d 25 (App.Div. 1956). Only those parties who hold an interest in the property as of the date of taking may receive from that condemnation award a proper divisional share of indemnity for its particular loss, id.; Wayne Co., Inc. v. Newo, Inc., 75 N.J. Super. 100, 107, 182 A.2d 369 (App.Div. 1962), the actual apportionment of that interest taking place at a separate allocation proceeding. The apportionment *260 of that amount to those persons claiming an interest therein is a matter of no concern to the condemnor. See 29A C.J.S. Eminent Domain § 197, at 1103. Thus, an award of these funds to any party other than the Costellos would deny them just compensation. Therefore, we direct that the $1.1 million excess payment for the leasehold received by Newport shall be paid to the Costellos.
Newport's cross-appeal is clearly without merit. R. 2:11-3(e)(1)(E). Although in some circumstances an option to purchase is compensable, see Jan-Mar, supra, the terms of the option in this case show that it was personal to CSA and expressly void against an assignee of CSA's leasehold interest.

CONCLUSION
We affirm the jury award in the condemnation action. The trial judge's allocation determination that Newport should be compensated for its leasehold interest is modified, however, by reducing Newport's allocation to $1,250,000, the amount paid for that interest.
NOTES
[1] Due to certain factual and legal similarities in the appeals, we consolidate these cases for the purpose of this opinion.
[2] Although CSA was named a defendant in the trial court and a respondent herein, it did not participate in either proceeding.
[3] Glimcher Co. is one of three collaborating partners which together own Newport.
[4] In general, a fair market value determination should not be based upon enhancement caused by the very project for which condemnation is sought.
[5] This, we take it, referred to the net annual rental, after expenses, for truck terminal purposes as set forth in Hendricks' appraisal report.
[6] Another scenario (not presented on the record before us) shows why a builder-developer-condemnor cannot be permitted to speculate by acquiring leasehold interests in property to be condemned. A project of this nature is often wholly or nearly entirely financed, whether publicly or privately. To the extent such a developer has "mortgaged out," the amount borrowed being paid to it to cover acquisition and construction costs, there would be less incentive to keep down the price of acquisition or to contest vigorously a condemnation award, if the developer expected to realize a quick and substantial cash profit through the leasehold allocation procedure. In short, there is a potential for conflict of interest, whether or not actually exploited.