CRABTREE, J.T.C.
These are consolidated local property tax cases, wherein plaintiff seeks direct review of the 1991,1992, and 1993 assessments on its property located in Livingston, New Jersey. The property consists of 36 separately assessed contiguous parcels (some consisting of two or more lots) which, in the aggregate, comprise the East Orange Water Reserve.[1]
The aggregate assessments were as follows:
1991 $9,479,000
1992 $9,541,300
*38 1993 $9,541,300[2]
The property, the site of a large, underground aquifer serving as a water supply for residents of East Orange, contains approximately 1,422 acres in Livingston,[3] of which 731 are wetlands.
The tax value of the lands in question has been the subject of judicial review on two prior occasions. The earlier case was In re Appeal of East Orange, 80 N.J.Super. 219, 193 A.2d 377 (App.Div.), certif. denied 41 N.J. 200, 195 A.2d 468 (1963), involving tax year 1957, wherein the court approved of a valuation approach which divided the acreage into various categories based upon elevation above sea level and their condition as wooded, cleared, or under water. The municipality’s expert ignored value per acre and used a method which assumed prospective uses to include two public golf courses, a public park, and a specified number of buildings. The court rejected this approach as “speculative,” “theoretical at best,” and “unrealistic.” Id. at 228, 193 A.2d 377.
In the later decision, involving 1961, 1962, and 1963, the court again concluded that the land had to be divided into its various classifications, following which a value had to be determined for each classification and an assessment fixed by simply adding the total of the lands in each category. In re Appeal of the City of East Orange, 103 N.J.Super. 109, 246 A.2d 722 (App.Div.1968).
Both decisions followed the method prescribed by the Supreme Court in Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952), namely, a “comparison of the representative component parts of the various classifications of the lands ... with the true value of comparable parcels of land owned by private persons ... measured by the standard of value established by a fair and bona fide sale at private contract.” Id. at 308, 88 A.2d 211.
*39 Two significant changes affecting the subject property’s value have occurred since the 1960’s: the 1987 enactment of the Freshwater Wetlands Protection Act, L. 1987, c. 156, N.J.S.A. 13:9B-1 to -30 and the moratorium on sewer connections for new residential construction, which, defendant concedes, is of indefinite duration.
The Freshwater Wetlands Protection Act effectively prohibits any activity which disturbs the wetlands on the subject property. The same proscription applies to the so-called transition area, which is the buffer strip abutting the wetlands. The size of the transition area depends upon whether the abutting wetlands are of exceptional resource value or of merely intermediate resource value. If the wetlands are the habitat for one or more threatened or endangered species, the wetlands are of exceptional resource value, and the transition area is 150 feet wide; if the wetlands do not contain threatened or endangered species but are not isolated or man-made drainage ditches, swales, or detention facilities, they are of intermediate resource value, and the transition area is 50 feet wide. N.J.S.A. 13:9B-7a., c.; N.J.A.C. 7:7A-6.1(d)(e).
Plaintiff has offered testimony of two individuals tending to establish the presence of two species on the threatened or endangered list, namely, the barred owl and the red-shouldered hawk.
The moratorium on sewer connections for new residential construction was imposed by defendant-municipality at the direction of the former Department of Environmental Protection and Energy (“DEPE”) on or about June 6,1988. While defendant acknowledges the existence of the moratorium and that it is of indefinite duration, it contends that sewer connection alternatives are available to the suppositious buyer of the subject property and thus, that the property’s highest and best use is for residential development (of the uplands portion), consistent with existing zoning regulations.[4]
*40 Plaintiffs valuation expert, following the Supreme Court mandate in Newark v. West Milford Tp., supra, first divided the subject property into seven parcels. He then identified, within each parcel, the quantum of developable acres, the quantum of non-developable upland acres and the quantum of other non-developable acres. In the latter category, he lumped wetlands, transition area, landlocked upland, and 100-year flood plain.
The expert’s breakdown of the parcels and the composition of each is best understood when expressed in tabular form as follows:
Size Developable Constrained Wetlands and Parcel (Acres) Acres Upland Transition area
1 336.24 3 2.37 330.87
2 57.64 2 0.88 54.76
3 376.67 18 8.07 350.60
4 64.04 12 3.35 48.69
5 261.54 31 51.29 179.25
6 163.57 14 12.59 136.98
7 162.63 6 7.41 147.22
Relying upon eight sales of developable vacant land, the expert estimated the value of developable acreage in Parcel 3 to be $50,000 an acre. He arbitrarily assigned one-third of that value to the non-developable upland acreage, and on the basis of eight sales of wetlands, he estimated the value of the other non-developable acreage in all seven parcels at $2,000 an acre.
He made qualitative adjustments about the values of developa-ble acreage in Parcel 1, 2, and 4 through 7, compared to Parcel 3. Parcel 1 was deemed 20% inferior; Parcel 2 was the same as Parcel 3; Parcel 4 was deemed 10% superior; Parcel 5 was the same as Parcel 3; Parcel 6 was deemed 10% superior; Parcel 7 was deemed 20% superior.
Thus, his value estimates for all three assessing dates, prior to adjustment for the sewer moratorium, were as follows:
Parcel 1 (Block 291, Lots 2A, 2B, 10C, 22-26, 28B, 28C,
‘ 29B, 29C, 37-40, 41A, 41B, 42, 43A, 45B, 46)
Developable acres Value
3 acres @ $40,000 $120,000
*41 Non-developable upland acres 2.37 acres @ $13,300 $31,521
Other non-developable acres 330.87 acres @ $500 (The expert deemed the flood-prone lands in Parcel 1 to be worth no more than $500/acre) $165,435
Total (rounded) $317,000
Parcel 2 (Block 291, Lot 10B)
Developable acres 2 acres @ $50,000 $100,000
Non-developable upland acres 0.88 acres @ $16,650 $14,652
Other non-discoverable upland acres 54.76 acres @ $2,000 $109,520
Total (rounded) $224,200
Parcel 3 (Block 293, Lots 4-9, 10C, 13A, 13C, 16-18, 28)
Developable acres 18 acres @ $50,000 $900,000
Non-developable upland acres 8.07 acres @ $16,650 $134,366
Other non-developable upland acres 350.60 acres @ $2,000 $701,200
Total (rounded) $1,735,600
Parcel 4 (Block 293, Lots 10B, 11, 12, 13B)
Developable acres 12 acres @ $55,000 $660,000
Non-developable upland acres $3.35 acres @ $18,315 $61,355
*42 Other non-developable acres 48.69 acres @ $2,000 $97,380
Total (rounded) $818,700
Parcel 5 (Block 292, Lots 2B, 4C, 4E, 5, 6, 7C, 8, 9, 11, 12)
Developable acres 31 acres @ $50,000 $1,550,000
Non-developable upland acres 51.29 acres @ $16,650 $853,979
Other non-developable acres 179.22 acres @ $2,000 $358,440
Total (rounded) $2,762,400
Parcel 6 (Block 292, Lots 1, 2C, 3, 4D, 7B)
Developable acres 11 acres @ $55,000 $605,000
Non-developable upland acres 14.98 acres @ $18,315 $274,386
Other non-developable acres 137.59 acres at $2,000 $275,180
Total (rounded) $1,154,500
Parcel 7 (Block 244, Lot 7 and Block 244A, Lots 3B, .4A, 4B)
Developable acres 8 acres @ $60,000 $480,000
Non-developable upland acres 7.41 acres @ $20,000 $148,200
Other non-developable acres 147.22 acres @ $2,000 $294,440
Total (rounded) $922,600
Total value of all parcels $7,935,000
*43 As the final step in the valuation process plaintiffs expert discounted the developable uplands in all parcels to account for a 5-year delay in development by reason of the sewer moratorium. The discount rate was 15%, resulting in a discount factor of .497177 and a final value estimate for all developable land of $2,945,954. This reduced his total estimate for all lands in all seven parcels to $4,951,549, which he rounded to $5,000,000.
Defendant’s expert, while arriving at separate value estimates for each of the three years under review, relied upon the same set of four comparable vacant land sales for his valuation of the developable portion of the subject, which he concluded to be 806 acres and 356 developable lots. He utilized another set of four comparable land sales for the undevelopable portion, which he concluded to be 635 acres and which he characterized as nature preservation and recreational lands.
The expert’s final value estimates were as follows:
October 1, 1990
Land considered to have development potential — 356 potential lots @ $95,000/lot $33,820,000
Nature preserve/reereational lands — 635 acres @ $5,000/acre $3,175,000
Total $36,995,000
October 1, 1991
Land considered to have development potential — 356 potential lots @ $85,000/lot $30,260,000
Nature preserve/reereational lands — 635 acres @ $5,000/acre $3,175,000
Total $33,435,000
October 1, 1992
Land considered to have development potential — 356 potential lots @ $83,000/lot $29,550,000
*44 Nature preserve/recreational lands — 635
acres @ $5,000/acre $3,175,000
Total $32,725,000
Defendant’s expert assumed that sewer connections would be available through Millburn and the Joint Meeting of Essex and Union Counties. He opined that if there were development plans for the developable portion of the property, Millburn would be notified and Millburn would then seek permission of the Joint Meeting for a sewer hookup. He observed, further, that during the applicable tax years, there was capacity through the Joint Meeting for a hookup.
For the reasons hereinafter stated, I find that the highest and best use of the subject property, in its entirety, is for open space or conservation.
The moratorium on sewer connections for new residential construction, as defendant acknowledges, is of indefinite duration. Defendant, however, contends that an alternative is available, namely, sewer hookups through the Joint Meeting of Union and Essex Counties. The court, on plaintiffs application at the trial, ruled that defendant bore the burden of producing evidence on the issue of an available alternative. The court’s failure to allocate such burden could have severely prejudiced plaintiff in the presentation of its proofs. Blitz v. Hutchinson, 252 N.J.Super. 580, 590-94, 600 A.2d 485 (App.Div.1991); Evid.R. 101(b)(1)(2). Defendant having conceded the existence of a sewer moratorium of indefinite duration in the municipality, the burden of producing evidence to demonstrate the existence of a sewer hookup alternative, rests with defendant. Biunno, Current N.J.Rules of Evidence, comment 2 to Evid.R. 101(b)(1) (1995).
I find that defendant has failed to carry its burden.
According to the credible, uncontradicted testimony of Neil Yoskin, Esq., an expert in regulatory aspects of water quality planning, the hookup of a developer of the subject property to the Joint Meeting of Essex and Union Counties, a consortium of *45 municipalities formed pursuant to the New Jersey Water Quality Planning Act, N.J.S.A. 58:11A-1 to -16 to administer wastewater management facilities and sewer capacities, involves a system of stratified approvals, first, by the adjoining municipality (here, Millburn), then the Joint Meeting, and finally, the DEPE (now the Department of Environmental Protection).[5] Failure to obtain approval at any stratum, e.g., Millburn, would destroy the opportunity for sewer connection.
Yoskin concluded with his opinion, based upon his extensive knowledge and experience in the field, that the prospect of obtaining sewerage capacity for residential development in the subject property was so problematic and beset with so many hurdles that no developer would purchase the property for residential development.
Defendant proffered a licensed professional engineer as an expert in regulations and practices relating to sewer connection. That expert concluded that a sewer connection through the Joint Meeting was feasible. In support of his conclusion he relied upon conversations with Robert Bocchino, Livingston’s Junior Engineer, Joseph Roberts, Livingston’s Planning Director, Charles Tahaney, Livingston’s Town Manager, Tim Gordon, Millburn Township Manager, and Michael Brinker, Executive Director of the Joint Meeting. Mr. Bocchino, who testified at trial as plaintiffs witness, indicated only a peripheral involvement with sewer treatment in Livingston; he was not familiar with the division of the State into water planning districts, and he was not even sure that the subject property was included in the Livingston planning district for wastewater management purposes.
There is no evidence pertaining to what Mr. Roberts may have done or said to the engineering expert that may have assisted the latter in formulating his opinion. Roberts was not called to *46 testify. The testimony of Mr. Tahaney, who was called as a witness for plaintiff, provided no support for the expert’s opinion. Mr. Tahane/s sole contribution was his knowledge of an agreement between Millbum and Livingston pertaining to hookups for a hospital, a restaurant, and a small residential development, all of which antedated the enactment of the Water Quality Planning Act and the creation of the Joint Meeting.
Mr. Gordon, according to the engineering expert’s testimony on cross-examination, told the latter nothing about the chances that Millburn would approve the plan, but he, Gordon, volunteered the information that Millbum had placed that portion of the reserve lying within its borders in a conservation zone. Mr. Brinker, Executive Director of the Joint Meeting, told the expert that the Joint Meeting had the capacity to accept additional gallonage from Millburn, but that approvals would be needed.
The engineering expert’s opinion is further compromised by palpable inconsistency in his own testimony. At one point, when asked what he would advise the developer as to the possibility of securing approval from the Joint Meeting for the hookup, he replied: “Joint Meeting is not a problem.” A moment later, when asked about the possibility of Millburn approving the hookup, he answered:
Now, if you ask me what the probability that they’re [sic] approve it is, I really can’t answer that. That’s probably either seven or nine governing body members that I have no idea how they would vote____ (Emphasis supplied)
Given the requirement that Millburn, as well as the Joint Meeting, approve the hookup, his optimism about Joint Meeting approval is vitiated by his uncertainty over approval by Millburn’s governing body.
As if this were not enough, the credible evidence shows that, when a proposal was made in 1987 for a commercial development on the subject property, the Millbum Township Committee adopted a resolution vigorously opposing the proposed development as a “serious threat to the environment of the residents of west Essex County.”
*47 The probative utility of an expert’s opinion depends not only upon the expert’s analysis, but also upon the facts offered in support of the opinion. Dworman v. Tinton, Falls, 1 N.J.Tax 445 (Tax 1980), aff'd o.b. per curiam 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.), certif. denied 88 N.J. 495, 443 A.2d 709 (1981). Here, there was not one scintilla of evidence to support the expert’s conclusion that sewer connections for new residential development were available notwithstanding the Livingston moratorium, which was of indeterminate duration.
Land subject to a building moratorium (or, what is the same, a moratorium on sewer connections for new construction) cannot be assessed as though the moratorium did not exist. Cappture Realty Corp. v. Board of Adj. of Elmwood Park, 126 N.J.Super. 200, 217, 313 A.2d 624 (Law Div.1973), aff'd 133 N.J.Super. 216, 336 A.2d 30 (App.Div.1975).
Similarly, this court has held that, where no sewers are available for a particular property involved in a tax appeal, and there is no probability that sewers will be available in the foreseeable future, the highest and best use cannot be residential. West Orange v. Goldman’s Estate, 2 N.J.Tax 582 (Tax 1981). This is but one application of the salutary principle that governmental restraints on land use have a material effect on value for tax purposes. Bergen County Associates v. East Rutherford Boro., 12 N.J.Tax 399 (Tax 1992), affd o.b. per curiam 265 N.J.Super. 1, 625 A.2d 524 (App.Div.), certif. denied 134 N.J. 482, 634 A.2d 528 (1993); Riorano v. Weymouth Tp., 4 N.J.Tax 550 (Tax 1982), affd per curiam 6 N.J.Tax 253 (App.Div.1983); Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax 1982). See Inmar Associates, Inc. v. Carlstadt Boro., 112 N.J. 593, 600, 549 A.2d 38 (1988).
In view of the foregoing, the court finds that the indefinite duration of the ban on sewer hookups for new residential construction precludes use of any part of the subject property for residential purposes notwithstanding the fact that the property is zoned residential.
*48 As the highest and best use of the property in its entirety is for open space/conservation, it is appropriate at this juncture to examine the vacant land sales utilized by the valuation experts that pertain to non-developable acreage.
For his non-developable acreage valuation, plaintiffs expert relied upon five Fairfield sales, four of which occurred between December 12, 1986, and January 11, 1989. All the parcels involved were wetlands. The sale prices ranged from $21 per acre to $1,176 per acre. The fifth sale, also involving a wetlands parcel, occurred on September 17, 1993, for a price of $208 per acre.
The expert also analyzed three other sales of wetlands. These sales involved lands in Lincoln Park, Denville, and Long Valley. The sales occurred on June 29,1988, June 8,1989, and December 2,1989, for prices ranging from $1,106 per acre to $3,125 per acre.
On the basis of these sales, as adjusted for time, location and other factors, the expert valued the non-developable acreage at $2,000 per acre for all valuation dates, except for a flood-prone parcel in Block 291, which he valued at $500 per acre.
Defendant’s expert relied upon four sales of undevelopable land for all three valuation dates. These sales are worth examining in detail, because of striking similarity of the lands involved to the subject property.
Sale # 1, involving 128.136 acres in Passaic Township, Morris County, took place on September 28,1988. The consideration was $269,000, or $2,099 per acre. The property was sold by the New Jersey Conservation Foundation to Morris County for annexation of the Passaic River Park. The parcel has extensive flooded areas and the soils are classified as hydric. The property has no development potential. Sale # 2, involving 35.3 acres in Harding Township, Morris County, took place March 11,1992. The consideration was $200,000, or $5,666 per acre. The property was sold by GRK Partnership to The Trust for Public Land for resale to the U.S. Fish and Wildlife Service and annexation to the Great Swamp Wildlife Refuge. The property is about 40% wooded. It *49 is located in the Passaic River flood plain and is impacted by frequent flooding. There are wetlands over most of the site, which is considered non-developable.
Sale #3, involving 14.6 acres in Passaic Township, Morris County, took place on December 7, 1988. The consideration was $90,000, or $6,164 per acre. The property was sold by Passaic Township to the United States for annexation to the Great Swamp Wildlife Refuge. The parcel is level and brush-covered. It consists of hydric soils and is non-developable.
Finally, Sale #4, involving 9.87 acres in Montville Township, Morris County, took place on December 4, 1991. The consideration was $45,000, or $4,558 per acre. The property was sold by Davanne Realty Co. to Morris County for use as a county park. The parcel consists of gently sloping forest land. It is located within the Rockaway River Watershed and the Passaic River Basin. The soils have been designated wetlands, and the site is not developable.
On the basis of these sales, the expert valued the non-developa-ble portion of the subject at $5,000 per acre on all valuation dates. He opined that the values of non-residential vacant land remained relatively stable over the time period spanned by the three valuation dates.
The testimony and appraisal of defendant’s expert are persuasive on the issue of the valuation of non-developable lands. He provided significantly more detail about these sales than plaintiffs expert provided concerning his sales of non-developable vacant land. The parcels involved in the comparable sales of defendant’s expert offer striking similarities in the contemplated use, in wetlands designation and soil composition to the subject. Thus, I give great weight to the opinion of defendant’s expert as the facts and reasoning amply support his conclusion. See Apex Trucking v. Secaucus, 1 N.J.Tax 417, 420 (Tax 1980).
*50 In view of the foregoing,[6] I conclude that the true value of the subject property, in its entirety, is $5,000 per acre for all three valuation dates, or $7,111,650.[7] As this amount is less than the assessment for each year, plaintiff is entitled to relief under N.J.S.A. 54:51A-6(b), by application of the general average ratio to the true value as herein found.
The municipality’s average ratios, as duly promulgated by the Director, Division of Taxation, were as follows:
1991- 27.12%
1992- 28.47%
1993- 27.65%
Thus, judgment will be entered indicating the aggregate assessments to be as follows:
1991- $1,916,100
1992- $2,024,700
1993- $1,966,400
The parties will submit computations pursuant to R. 8:9-3, allocating the aggregate assessments among the several lots under appeal.

The property is not a watershed (i.e., a water reservoir) subject to the Watershed Protection Act, L. 1988, c. 163, as amended by L. 1990, c. 19, which imposed a moratorium on the conveyance of watershed lands. See letter from James F. Hall, Assistant Commissioner, DEPE, to Susan Feeney, Esq., dated September 7, 1993.

 Block 291, Lots 29B and 29C, a single line item assessed at $62,300, was not appealed for 1991.

 The water reserve in its entirety contains approximately 2,300 acres, about 900 of which are located in Millburn, a municipality on Livingston’s southern border.

 Septic tanks are not a viable alternative to sewers.

 The Department of Environmental Protection and Energy (DEPE) was redes-ignated as the Department of Environmental Protection (DEP) by Reorganization Plan No. 001-1994, effective July 4, 1994. During the years in issue, the agency was still known as the DEPE.

 The court’s findings and conclusions concerning the effect of the sewer ban render unnecessary a decision on the impact of the presence of threatened or endangered species, or whether the subject property is a nesting or breeding habitat for any such species.

 Block 291, Lots 29B and 29C, a single line item, was not appealed for 1991. The assessment for that item was $62,300, or .65 of 1% (.0065). The 1991 value will be reduced by that percentage, which amounts to $46,439. The true value for 1991 thus becomes $7,065,200 (rounded).